PATRICIA DAYNER *v.* ARCHDIOCESE OF
HARTFORD ET AL.
(SC 18468)

Rogers, C. J., and Norcott, Palmer, McLachlan, Eveleigh and Vertefeuille, Js.

Argued March 16—officially released August 2, 2011

*Lorinda S. Coon*, with whom, on the brief, was *Jeffrey C. Pingpank*, for the appellants (defendants).

*Henry F. Murray*, with whom, on the brief, was *Nicole M. Rothgeb*, for the appellee (plaintiff).

*Opinion*

NORCOTT, J. This appeal requires us to consider the contours of the ministerial exception, under the first amendment to the United States constitution,[1] to Connecticut courts' subject matter jurisdiction over certain employment related claims brought against religious institutions. The plaintiff, Patricia Dayner, brought this action against the defendants, the Archdiocese of Hartford (archdiocese) and Father Stephen Bzdyra, pastor of Saint Hedwig's Parish in Naugatuck, claiming that their refusal to renew her contract for employment as the principal of Saint Hedwig's School (school) constituted, inter alia, wrongful termination in violation of public policy, breach of implied contract and breach of promissory estoppel. The defendants appeal[2] from the decision of the trial court denying their motion to dismiss the action on the ground that adjudication of the plaintiff's claims calls for impermissible judicial interference in the internal governance of the archdiocese with respect to its selection of religious leaders. After determining that we have subject matter jurisdiction over this interlocutory appeal pursuant to *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983), we further conclude that, in considering whether the ministerial exception is applicable in a particular case, a Connecticut state court must follow the standard articulated by the United States Court of Appeals for the Second Circuit in *Rweyemamu* v. *Cote*, 520 F.3d 198, 208–209 (2d Cir. 2008), and consider whether: (1) the employment relationship is religious in nature; and (2) if so, whether

[1] The first amendment to the United States constitution provides in relevant part: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." The first amendment has been made applicable to the states through the fourteenth amendment. See, e.g., *State* v. *DeLoreto*, 265 Conn. 145, 153, 827 A.2d 671 (2003).

[2] The defendants appealed from the decision of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

adjudicating the particular claims and defenses in the case would require the court to intrude into a religious institution's exclusive right to decide matters pertaining to doctrine or its internal governance or organization. Having applied this standard to the various claims in the plaintiff's complaint, we reverse the judgment of the trial court and remand the case with direction to render judgment dismissing the complaint in its entirety.

The record reveals the following facts, as set forth in the complaint, and procedural history. The plaintiff was employed by the archdiocese since 1975 as a teacher and Catholic school administrator; she served as principal of the school from 1988 until 2005. In the plaintiff's last comprehensive performance evaluation,[3] dated June 24, 2004, which reviewed the 2003–2004 school year, Sister Loretta Francis Mann, who was employed as assistant superintendent of elementary school education at the archdiocese, gave the plaintiff a positive review, along with some written "recommendations" regarding specific areas of improvement. In July, 2004, the plaintiff accepted from Bzdyra, who as parish pastor was the plaintiff's supervisor, a signed contract of employment as principal for the 2004–2005 school year. On August 9, 2004, the plaintiff attended the meeting of the school's board of education, and shared aloud her performance evaluation, stating that

[3] The archdiocese maintains numerous policies, procedures and practices that represent its commitment to a progressive and mutually engaging process to promote the improvement of employee performance prior to termination. These procedures require supervisors to document all findings, inform the employee of all shortcomings and performance deficiencies in light of specific facts, openly discuss problem areas, give the employee a full and fair opportunity to improve and implement changes, and provide the employee with all necessary assistance and guidance during that process. The archdiocese instructed the plaintiff about these policies and procedures several times during her thirty years of employment, and, as a principal, she conducted many performance evaluations and implemented performance improvement plans for teachers and staff.

she would make the necessary efforts to improve in the noted areas.

Thereafter, on August 22, 2004, Bzdyra, accompanied by a deacon, met with the plaintiff after a Mass. Bzdyra then informed the plaintiff in writing of his concerns regarding her performance as principal, particularly in light of a report issued by the Commission on Independent Schools. The letter concluded that the school "faces many challenges in the coming school year and beyond. I want you to reflect about the steps you will take to improve in these areas. I want to sit down with you in the beginning of the school year so we may discuss the changes you will make and implement, and your plans for the school year."

In September, 2004, the plaintiff and Bzdyra met in her office at the school to discuss her improvement plans. Bzdyra refused, however, to discuss the changes that the plaintiff already had implemented, or her future plans. Instead, he became abusive and ended the meeting after telling the plaintiff that she " 'wasn't a leader,' " " 'could do nothing to improve,' " and " 'never should have been a principal.' "

Thereafter, on or about November 23, 2004, Bzdyra initiated a conversation with the plaintiff in the school cafeteria and asked her intentions for the following school year. The plaintiff was confused and stunned by the inquiry, but stated that she intended to remain as principal of the school. After again insulting the plaintiff's leadership abilities, Bzdyra then told her that if she did not leave, he would tell the school board that he would not renew her contract and would request her removal from the school. At the conclusion of their discussion that day, however, Bzdyra offered the plaintiff an alternate position for the following school year teaching third grade and told her to contact Mann if she was interested in that job. The following day, the

plaintiff told Bzdyra that if she could not continue as principal, she nevertheless was interested in remaining as a teacher. Bzdyra then demanded that the plaintiff submit to him a letter of resignation.

During that November 23, 2004 conversation, Bzdyra referred to the plaintiff's failure to " 'stick up for [him]' " in October, 2003, when an eighth grade student and her mother met with the plaintiff and complained that Bzdyra's use of sexually explicit language while he taught his weekly religion course made the student and other girls uncomfortable. When the plaintiff subsequently spoke to Bzdyra about the student's concerns,[4] he demanded that she summon the student to the office immediately. After the student came to the office, Bzdyra berated her to tears, requiring the plaintiff to comfort the student before she could return to class. Later that day, Bzdyra told the plaintiff that he would no longer teach the religion class and that the student had " 'serious problems.' " Bzdyra then ordered the plaintiff to call the department of children and families (department) to report the student; the plaintiff, however, refused, believing that as a mandated reporter,[5] she did not have information warranting a department referral, and that Bzdyra's demand was simply retaliation against the student for exercising her right to make a complaint.[6]

---

[4] The plaintiff had told the student and her mother that she would speak to Bzdyra and, if necessary, transfer the student to a different religion class.

[5] See General Statutes § 17a-101 et seq.

[6] The issue of Bzdyra's allegedly inappropriate comments again arose later in October, 2003, when representatives of the New England Association of Schools and Colleges (association) conducted a site visit at the school. During this visit, a number of eighth grade girls, including the student who had complained to the plaintiff, informed Ann Marie Donnelly, a site visitor, that Bzdyra had made sexual comments that had made them feel uncomfortable. Donnelly then reported these complaints to Archdiocesan officials, including Mann; Mann subsequently informed the plaintiff and Bzdyra that the association was planning to report Bzdyra's comments to the department.

At the Sunday Mass following the November, 2004 meeting, Bzdyra asked the plaintiff about the status of the letter of resignation that he had requested. When she told him that she was working on it and had not yet spoken to Mann, he became abusive and began to yell at her. On Monday, November 29, 2004, the plaintiff submitted a letter indicating that she was resigning as principal effective June 30, 2005, and noting her understanding that she would receive a full-time teaching contract for the 2005–2006 school year. On or about November 30, 2004, the plaintiff requested a meeting with Mann. She informed Mann about her interactions with Bzdyra; Mann asked why she had submitted the resignation letter. When the plaintiff stated that she had felt forced to do so, Mann told her instead to respond to the annual letter of intent form (form) that the archdiocese would issue in January, 2005.

In January, 2005, the plaintiff completed the form and advised the archdiocese of her intent to return as principal. Later that month, however, the plaintiff was surprised and upset to see a job opening for her position listed in a newsletter written by Dale Hoyt, the superintendent of the archdiocese's schools, which was distributed to school faculty, staff and school boards throughout the archdiocese. Thereafter, on January 20, 2005, the plaintiff sent to Bzdyra and Hoyt a letter formally rescinding her earlier letter of resignation and stating that she did not understand Bzdyra's reasons for not renewing her employment contract or why he did not give her the opportunity to address the performance concerns.[7]

[7] Later, on the evening of January 20, 2005, the plaintiff spoke to Bzdyra by telephone; he directed her to tell concerned parents whom she had informed of the confusion about her employment status that the parents could not meet at the school without his permission, and that he would arrange to meet with them at a later date. Bzdyra also again complained about the plaintiff's failure to stick up for him with regard to the student's complaints in October, 2003, and noted that he almost had to leave the parish after representatives from the association had reported those complaints to the archdiocese. See footnote 6 of this opinion.

The plaintiff subsequently received a letter from Bzdyra dated March 21, 2005, informing her that her contract of employment as principal would not be renewed for the following school year, and that her last day of employment would be June 30, 2005.[8] On or about June 23, 2005, the plaintiff learned that the archdiocese had relieved her from all further duties as principal. After it removed her as principal, the archdiocese did not offer the plaintiff a teaching or administrative position at the school or elsewhere.

The plaintiff then brought this action for money damages[9] against the defendants in a six count complaint claiming that, by not renewing her contract of employment, the archdiocese: (1) breached an implied contract, created by its formal performance evaluation procedures; see footnote 3 of this opinion; following Bzdyra's refusal to engage in that process; (2) breached its implied covenant of good faith and fair dealing; (3) breached the doctrine of promissory estoppel; (4) terminated her employment in violation of public policy, in retaliation for her refusal of Bzdyra's order to make a false report to the department; and (5) negligently inflected emotional distress on her through its actions. In the sixth count, the plaintiff alleged that Bzdyra had tortiously interfered with the plaintiff's business expectancies and relationships with the archdiocese.

Subsequently, the defendants moved to dismiss the plaintiff's complaint, claiming that her action is barred under the " 'ministerial exception' to judicial authority [that] precludes a court from adjudicating employment

---

[8] On or about February 4, 2005, the plaintiff met with Hoyt, Mann and Bzdyra in an attempt to resolve the situation. She made clear that she wanted to remain as principal of the school. Bzdyra responded by stating, " 'Either she goes, or I go.' " Shortly thereafter, the archdiocese informed the plaintiff that it would place her at another school.

[9] The plaintiff sought compensatory damages, lost wages, punitive damages, attorney's fees, costs and prejudgment interest.

disputes between religious institutions and their religious leaders." The trial court denied the defendants' motion to dismiss, noting in its memorandum of decision that the Appellate Court had adopted the ministerial exception as a matter of Connecticut law in *Rweyemamu* v. *Commission on Human Rights & Opportunities*, 98 Conn. App. 646, 911 A.2d 319 (2006), cert. denied, 281 Conn. 911, 916 A.2d 51, cert. denied, 552 U.S. 886, 128 S. Ct. 206, 169 L. Ed. 2d 144 (2007). Observing that whether the plaintiff was an ordained member of the clergy was not outcome determinative, the trial court cited *Hartwig* v. *Albertus Magnus College*, 93 F. Sup. 2d 200, 212–13 (D. Conn. 2000), for the proposition that even a clergy member may bring an action against a religious employer if the particular relationship did not give rise to claims and defenses that are religious in nature, and that courts will resolve such disputes if they do not require an "inquiry into competing interpretations of church law or policy." The trial court then concluded that all of the plaintiff's claims "involve discrete inquiries that do not intrude into purely religious matters or issues of church governance," including her claim for wrongful termination, which "involves a discrete pretextual inquiry into whether . . . Bzdyra's efforts to terminate the plaintiff's employment as principal were motivated by or in retaliation for the plaintiff's refusal to 'stick up for him' regarding his unwanted sexual remarks to eighth grade girls."[10] Accordingly, the trial court denied the defen-

---

[10] Specifically, the trial court determined that the "claims for breach of implied contract [allege] that the policies of the [archdiocese] were not followed prior to the plaintiff's termination, thereby denying the plaintiff her contractual right to address her alleged performance problems and cure them in a timely manner. Similarly, the claim for promissory estoppel alleges that the defendant[s] made a clear and definite promise on which the plaintiff reasonably relied to her detriment. The court will not be required to consider matters of religious belief or practice in deciding these claims."

The trial court also noted that the "claims of tortious interference with contract and infliction of emotional distress are tort claims which pertain to the defendants' treatment of the plaintiff, a thirty year employee, vis-á-

dants' motion to dismiss and subsequent motion for reargument. This appeal followed.

I

We begin with the threshold issue of whether the trial court's denial of the defendants' motion to dismiss in this case is an appealable final judgment under General Statutes § 52-263.[11] We agree with the parties' position at oral argument before this court[12] that the trial court's denial of the motion to dismiss on the ground of a colorable claim to immunity under the ministerial exception is an appealable final judgment under the second prong of *State* v. *Curcio,* supra, 191 Conn. 31.

"As a general rule, an interlocutory ruling may not be appealed pending the final disposition of a case. . . . We previously have determined [however] that certain interlocutory orders have the attributes of a final judgment and consequently are appealable under . . . § 52-263. . . . In *State* v. *Curcio,* [supra, 191 Conn. 31], we explicated two situations in which a party can appeal an otherwise interlocutory order: (1) where the order or action terminates a separate and distinct proceeding, or (2) where the order or action so concludes the rights of the parties that further proceedings cannot affect them. . . .

vis the secular common law of the state. Resolution of these claims will not require the court to intrude into religious doctrine or practices."

[11] General Statutes § 52-263 provides in relevant part: "Upon the trial of all matters of fact in any cause or action in the Superior Court, whether to the court or jury, or before any judge thereof when the jurisdiction of any action or proceeding is vested in him, if either party is aggrieved by the decision of the court or judge upon any question or questions of law arising in the trial, including the denial of a motion to set aside a verdict, he may appeal to the court having jurisdiction from the final judgment of the court or of such judge . . . ."

[12] Prior to oral argument in this case, we raised this issue sua sponte in a letter to the parties, requesting that they be prepared to address at oral argument whether an appealable final judgment exists in this case.

"The second prong of the *Curcio* test focuses on the nature of the right involved. It requires the parties seeking to appeal to establish that the trial court's order threatens the preservation of a right already secured to them and that that right will be irretrievably lost and the [parties] irreparably harmed unless they may immediately appeal. . . . Thus, a bald assertion that the defendant will be irreparably harmed if appellate review is delayed until final adjudication . . . is insufficient to make an otherwise interlocutory order a final judgment. One must make at least a colorable claim that some recognized statutory or constitutional right is at risk." (Citations omitted; internal quotation marks omitted.) *Chadha* v. *Charlotte Hungerford Hospital,* 272 Conn. 776, 784–86, 865 A.2d 1163 (2005).

By way of background, we note that the ministerial exception at issue in this case "is constitutionally required by various doctrinal underpinnings of the [f]irst [a]mendment." (Internal quotation marks omitted.) *Rweyemamu* v. *Cote,* supra, 520 F.3d 207. When the ministerial exception applies, it provides the defendant with immunity from suit and deprives the court of subject matter jurisdiction. *Rweyemamu* v. *Commission on Human Rights & Opportunities,* supra, 98 Conn. App. 654–55; accord *Equal Employment Opportunity Commission* v. *Hosanna-Tabor Evangelical Lutheran Church & School,* 597 F.3d 769, 777 (6th Cir. 2010), cert. granted on other grounds, 563 U.S. 903, 131 S. Ct. 1783, 179 L. Ed. 2d 653 (2011);[13] *Alicea-Hernandez* v. *Catholic Bishop of Chicago,* 320 F.3d 698, 702 (7th Cir. 2003); *Pardue* v. *Center City Consortium Schools of the Archdiocese of Washington, Inc.,* 875 A.2d 669, 674 (D.C.), cert. denied, 546 U.S. 1003, 126 S. Ct. 619, 163 L. Ed. 2d 506 (2005); *Williams* v. *Episcopal Diocese of Massachusetts,* 436 Mass. 574, 577 n.2, 766 N.E.2d 820 (2002); see also *Friedlander* v. *Port Jewish Center,*

[13] See footnote 19 of this opinion.

588 F. Sup. 2d 428, 431 (E.D.N.Y. 2008) (declining to consider equity-based claims because applicability of ministerial exception deprived court of subject matter jurisdiction under Second Circuit's decision in *Rweyemamu* v. *Cote*, supra, 198), aff'd, 347 Fed. Appx. 654 (2d Cir. 2009), cert. denied, 559 U.S. 973, 130 S. Ct. 1714, 176 L. Ed. 2d 184 (2010); *Rojas* v. *Roman Catholic Diocese of Rochester*, 557 F. Sup. 2d 387, 398 n.7 (W.D.N.Y. 2008) (under Second Circuit's decision in *Cote*, "motions to dismiss involving the ministerial exception are properly addressed as challenges to the court's subject matter jurisdiction").[14] Indeed, the very

---

[14] We note, as did the Second Circuit in *Rweyemamu* v. *Cote*, supra, 520 F.3d 206 n.4, that some courts do not categorize ministerial immunity as a jurisdictional bar, but, rather, consider it akin to a legal defense like qualified immunity. See *Skrzypczak* v. *Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1242 (10th Cir. 2010); *Petruska* v. *Gannon University*, 462 F.3d 294, 302–303 (3d Cir. 2006), cert. denied, 550 U.S. 903, 127 S. Ct. 2098, 167 L. Ed. 2d 813 (2007); *Elvig* v. *Calvin Presbyterian Church*, 375 F.3d 951, 955 (9th Cir. 2004); *Natal* v. *Christian & Missionary Alliance*, 878 F.2d 1575, 1578 (1st Cir. 1989); *Celnik* v. *Congregation B'Nai Israel*, 139 N.M. 252, 255, 131 P.3d 102 (App. 2006). The issue remains an open question in the United States Courts of Appeal for the Fifth and Eleventh Circuits, although one district court in the Eleventh Circuit has recently concluded that the ministerial exception is not subject matter jurisdictional in nature. See *Hopkins* v. *DeVeaux*, United States District Court, Docket No. 1:10-CV-0572-JEC, 2011 U.S. Dist. LEXIS 27275, *30–31 (N.D. Ga. March 16, 2011).

This topic also is the subject of some academic debate as well. Compare B. Martin, comment, "Protecting Preachers from Prejudice: Methods for Improving Analysis of the Ministerial Exception to Title VII," 59 Emory L.J. 1297, 1333–34 (2010) (advocating raising ministerial exception under rule 12 [b] [6] rather than rule 12 [b] [1] of Federal Rules of Civil Procedure because "it is dangerous policy to allow the church to have the unfettered ability to mistreat its ministers without any fear of accountability in secular courts due to lack of subject matter jurisdiction"), with G. Kalscheur, "Civil Procedure and the Establishment Clause: Exploring the Ministerial Exception, Subject-Matter Jurisdiction, and the Freedom of the Church," 17 Wm. & Mary Bill of Rts. J. 43, 101–102 (2008) (arguing that treating ministerial exception as subject matter jurisdictional in nature "implements our [c]onstitution's recognition that the state is not the ultimate authority in all things— it embodies the constitutionally mandated principle that some things are above or beyond the jurisdiction of the law precisely because the [f]irst [a]mendment stands as an affirmation of the penultimacy of the state").

act of litigating a dispute that is subject to the ministerial exception would result in the entanglement of the civil justice system with matters of religious policy, making the discovery and trial process itself a first amendment violation. See, e.g., *McClure* v. *Salvation Army*, 460 F.2d 553, 560 (5th Cir.) ("[a]n application of the provisions of Title VII [of the Civil Rights Act of 1964] to the employment relationship which exists between . . . a church and its minister, would involve an investigation and review of these practices and decisions and would, as a result, cause the [s]tate to intrude upon matters of church administration and government which have so many times before been proclaimed to be matters of a singular ecclesiastical concern"), cert. denied, 409 U.S. 896, 93 S. Ct. 132, 34 L. Ed. 2d 153 (1972).

We previously have determined that, under the second prong of *State* v. *Curcio*, supra, 191 Conn. 31, a colorable claim to a right to be free from an action is protected from the immediate and irrevocable loss that would be occasioned by having to defend an action through the availability of an immediate interlocutory appeal from the denial of a motion to dismiss. See, e.g., *Chadha* v. *Charlotte Hungerford Hospital*, supra, 272 Conn. 787 (absolute immunity for statements made during judicial and quasi-judicial proceedings); *Shay* v. *Rossi*, 253 Conn. 134, 167, 749 A.2d 1147 (2000) (state sovereign immunity), overruled in part on other grounds by *Miller* v. *Egan*, 265 Conn. 301, 325, 828 A.2d 549 (2003). Thus, we find persuasive the District of Columbia Court of Appeals' decision to permit interlocutory appellate review of a trial court's denial of a motion to dismiss based on a church's first amendment immunity from suit because that issue is "unreviewable on appeal from a final judgment if the case proceeds to trial because the essence of the protection of immunity from suit is an entitlement not to stand trial or face the other burdens of litigation." (Internal quotation marks

omitted.) *Heard* v. *Johnson,* 810 A.2d 871, 877 (D.C. 2002). Accordingly, we conclude that we have jurisdiction under the second prong of *Curcio* over the defendants' interlocutory appeal from the trial court's denial of their motion to dismiss based on their colorable claim of entitlement to the ministerial exception.

## II

On appeal, the defendants claim that the ministerial exception, which was first articulated in *McClure* v. *Salvation Army,* supra, 460 F.2d 553, as an evolution of the ecclesiastical abstention doctrine established by the United States Supreme Court in *Watson* v. *Jones,* 80 U.S. (13 Wall.) 679, 727, 20 L. Ed. 666 (1872), requires dismissal of this action. They argue that Connecticut's variation of the ministerial exception, as articulated by the Appellate Court in *Rweyemamu* v. *Commission on Human Rights & Opportunities,* supra, 98 Conn. App. 646, is a "[r]obust" version of that doctrine that applies to nonordained employees whose jobs nevertheless are religious in nature, like the plaintiff. The defendants contend that, with respect to religious employees like the plaintiff, employment disputes like this case are "per se religious such that adjudicating them will necessarily tread on the church's protected rights" because the ministerial exception "exists to protect a church's right to make core decisions without the oversight or interference of civil authorities." Accordingly, the defendants argue in the present case that courts are categorically forbidden to inquire about the reasons for the plaintiff's termination or to consider her claims that the archdiocese failed to follow its own procedures, regardless of the trial court's conclusion that a court can make this determination without inquiry into church teaching or doctrine. The defendants further emphasize that, although the ministerial exception had its genesis in cases brought under federal antidiscrimination statutes, it is equally applicable to the plaintiff's common-law

tort and contract claims vis-á-vis her termination, as well as her related claim against Bzdyra individually.

In response, the plaintiff argues that the ministerial exception does not bar all employment claims against a religious institution. Specifically, the plaintiff urges us to follow our prior case law finding decisions of the Second Circuit particularly persuasive and to adopt that court's "more holistic and fact based test" articulated in *Rweyemamu* v. *Cote*, supra, 520 F.3d 208–209, which permits examination of the nature of the claims at issue in the case, rather than other federal circuits' narrower version of the doctrine advocated by the defendants, which ends the inquiry once it is determined that the plaintiff is a ministerial employee. The plaintiff relies on case law applying the Second Circuit's decision in *Cote*, namely, *Rojas* v. *Roman Catholic Diocese of Rochester*, supra, 557 F. Sup. 2d 387, and *Redhead* v. *Conference of Seventh-Day Adventists*, 566 F. Sup. 2d 125 (E.D.N.Y. 2008), aff'd, 360 Fed. Appx. 232 (2d Cir. 2010), for the proposition that a court does not decide religious issues when it determines whether a stated religious reason for termination is pretextual. The plaintiff further claims that the Appellate Court's decision in *Rweyemamu* v. *Commission on Human Rights & Opportunities*, supra, 98 Conn. App. 646, is limited only to employment discrimination claims, and that under *Petruska* v. *Gannon University*, 462 F.3d 294 (3d Cir. 2006), cert. denied, 550 U.S. 903, 127 S. Ct. 2098, 167 L. Ed. 2d 813 (2007), *Bollard* v. *California Province of the Society of Jesus*, 196 F.3d 940 (9th Cir. 1999), and *Minker* v. *Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354 (D.C. Cir. 1990), the ministerial exception does not bar common-law contract and tort claims brought by ministerial employees. Finally, the plaintiff emphasizes that the trial court properly denied the defendants' motion to dismiss because she seeks only money damages, rather than

reinstatement, and her claims are purely secular involving leadership, strategic planning and her refusal to make a false report to the department, and have nothing to do with matters concerning religious belief, worship or practice. We agree with the defendants and conclude that, under the ministerial exception as articulated by the Second Circuit in *Cote*, the trial court was required to dismiss all of the plaintiff's claims.

"The standard of review for a court's decision on a motion to dismiss [under Practice Book § 10-31 (a) (1)] is well settled. A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . [O]ur review of the court's ultimate legal conclusion and resulting [determination] of the motion to dismiss will be de novo. . . . When a . . . court decides a jurisdictional question raised by a pretrial motion to dismiss, it must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . . The motion to dismiss . . . admits all facts which are well pleaded, invokes the existing record and must be decided upon that alone." (Citation omitted; internal quotation marks omitted.) *Gold* v. *Rowland*, 296 Conn. 186, 200–201, 994 A.2d 106 (2010); see also *Conboy* v. *State*, 292 Conn. 642, 652–53, 974 A.2d 669 (2009) (discussing trial court's responsibility to conduct evidentiary hearing when "jurisdictional determination is dependent on the resolution of a critical factual dispute" or is "intertwined with the merits of the case"). "In undertaking this review, we are mindful of the well established notion that, in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged." (Internal quotation marks omitted.) *Conboy* v. *State*, supra, 650.

In the seminal case of *McClure* v. *Salvation Army,* supra, 460 F.2d 558, the United States Court of Appeals for the Fifth Circuit observed that "[t]he relationship between an organized church and its ministers is its lifeblood."[15] Citing a line of United States Supreme Court decisions that "began to place matters of church government and administration beyond the purview of civil authorities";[16] id., 559; the Fifth Circuit determined that the plaintiff in *McClure* had "charged that The Salvation Army engages in certain practices with regard to a minister's assignment, his salary, and his duties, which have been declared unlawful by Title VII," but that "an investigation and review of such matters of

[15] The Fifth Circuit described the "minister [as] the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern. Just as the initial function of selecting a minister is a matter of church administration and government, so are the functions which accompany such a selection. It is unavoidably true that these include the determination of a minister's salary, his place of assignment, and the duty he is to perform in the furtherance of the religious mission of the church." *McClure* v. *Salvation Army,* supra, 460 F.2d 559.

[16] See *McClure* v. *Salvation Army,* supra, 460 F.2d 560 ("First [a]mendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern." [Internal quotation marks omitted.]), quoting *Presbyterian Church in the United States* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 449, 89 S. Ct. 601, 21 L. Ed. 2d 658 (1969); *Kreshik* v. *St. Nicholas Cathedral of the Russian Orthodox Church of North America,* 363 U.S. 190, 190–91, 80 S. Ct. 1037, 4 L. Ed. 2d 1140 (1960) (holding unconstitutional application of common-law rule that precluded Russian Patriarch's appointees from exercising right to use and occupancy of cathedral granted by canon law); *Kedroff* v. *St. Nicholas Cathedral of the Russian Orthodox Church of North America,* 344 U.S. 94, 107, 73 S. Ct. 143, 97 L. Ed. 120 (1952) (holding unconstitutional state statute transferring administrative control of Russian Orthodox churches from Patriarch of Moscow to North American authorities); *Watson* v. *Jones,* supra, 80 U.S. 727 (ruling of Presbyterian Church's highest ecclesiastical body was final as to which of two battling factions had control over church property).

church administration and government as a minister's salary, his place of assignment and his duty, which involve a person at the heart of any religious organization, could only produce by its coercive effect the very opposite of that separation of church and [s]tate contemplated by the [f]irst [a]mendment." Id., 560. Thus, the court concluded that it lacked jurisdiction over the plaintiff's Title VII claims because application of that statute "to the employment relationship existing between . . . a church and its minister would result in an encroachment by the [s]tate into an area of religious freedom which it is forbidden to enter by the principles of the free exercise clause of the [f]irst [a]mendment." Id.

Although the United States Supreme Court has not addressed the ministerial exception to date; but see footnote 19 of this opinion; every federal circuit has adopted the doctrine pursuant to either or both the free exercise and establishment clauses of the first amendment.[17] Indeed, in *Rweyemamu* v. *Commission on*

---

[17] Some circuits conclude that civil courts' interference with a religious organization's internal governance, including its choice of spiritual leaders, implicates the free exercise clause of the first amendment. See *Skrzypczak* v. *Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1245–46 (10th Cir. 2010); *Equal Employment Opportunity Commission* v. *Hosanna-Tabor Evangelical Lutheran Church & School*, supra, 597 F.3d 777; *Rweyemamu* v. *Cote*, supra, 520 F.3d 208; *Petruska* v. *Gannon University*, supra, 462 F.3d 306–307; *Elvig* v. *Calvin Presbyterian Church*, 375 F.3d 951, 956 (9th Cir. 2004); *Alicea-Hernandez* v. *Catholic Bishop of Chicago*, supra, 320 F.3d 703; *Gellington* v. *Christian Methodist Episcopal Church, Inc.*, 203 F.3d 1299, 1303–1304 (11th Cir. 2000); *Equal Employment Opportunity Commission* v. *Catholic University of America*, 83 F.3d 455, 463 (D.C. Cir. 1996); *Scharon* v. *St. Luke's Episcopal Presbyterian Hospitals*, 929 F.2d 360, 363 (8th Cir. 1991); *Natal* v. *Christian & Missionary Alliance*, 878 F.2d 1575, 1578 (1st Cir. 1989); *Rayburn* v. *General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985), cert. denied, 478 U.S. 1020, 106 S. Ct. 3333, 92 L. Ed. 2d 739 (1986); *McClure* v. *Salvation Army*, supra, 460 F.2d 560. Many of the circuits also recognize that subjecting religious groups' leadership employment decisions to the litigation process would also result in impermissible governmental entanglement with religious decision making in violation of the establishment clause, particularly if courts are called upon to determine the validity of proffered religious bases for an

*Human Rights & Opportunities,* our Appellate Court reviewed the contemporary federal circuit authorities, and noted that " '[t]he ministerial exception is judicial shorthand for two conclusions: the first is that the imposition of secular standards on a church's employment of its ministers will burden the free exercise of religion; the second, that the state's interest in eliminating employment discrimination is outweighed by a church's constitutional right of autonomy in its own domain.' " *Rweyemamu* v. *Commission on Human Rights & Opportunities,* supra, 98 Conn. App. 652, quoting *Equal Employment Opportunity Commission* v. *Catholic University of America,* 83 F.3d 455, 467 (D.C. Cir. 1996). The Appellate Court stated that, for purposes of the jurisdiction of the commission on human rights and opportunities, our state's "administrative law . . . must recognize the ministerial exception in the enforcement of our employment discrimination statutes. The constitutional guarantee of the free exercise of religious authority requires secular institutions to defer to the decisions of religious institutions in their employment relations with their religious employees. In broader terms, administrative and judicial intervention in religious employment relationships would violate the constitutional prohibition against civil entanglement in ecclesiastic disputes." *Rweyemamu* v. *Commission on Human Rights & Opportunities,* supra, 654. Thus, the Appellate Court concluded that the ministerial exception precluded the exercise of administrative or judicial jurisdiction over a priest's claims of racial and ethnic

employment decision. See *Equal Employment Opportunity Commission* v. *Hosanna-Tabor Evangelical Lutheran Church & School,* supra, 781; *Rweyemamu* v. *Cote,* supra, 208–209; *Petruska* v. *Gannon University,* supra, 311–12; *Elvig* v. *Calvin Presbyterian Church,* supra, 957; *Gellington* v. *Christian Methodist Episcopal Church, Inc.,* supra, 1304; *Equal Employment Opportunity Commission* v. *Catholic University of America,* supra, 465–67; *Scharon* v. *St. Luke's Episcopal Presbyterian Hospitals,* supra, 362–63; *Rayburn* v. *General Conference of Seventh-Day Adventists,* supra, 1171.

discrimination and harassment arising from the failure of the Roman Catholic Diocese of Norwich to promote him to an administrative post. Id., 650–51, 654–55.

In determining whether a plaintiff's employment related claims against a religious institution are subject to the ministerial exception, the federal circuit courts generally rely in the first instance on the "primary duties analysis [that] requires a court to objectively examine an employee's actual job function, not her title, in determining whether she is properly classified as a minister."[18] *Equal Employment Opportunity Commission* v. *Hosanna-Tabor Evangelical Lutheran Church & School*, supra, 597 F.3d 781;[19] accord *Rweyemamu* v. *Cote*, supra, 520 F.3d 208 ("courts should consider the 'function' of an employee, rather than his title or the

---

[18] If a court applies this analysis and determines that a plaintiff is a secular, rather than ministerial, employee of a religious institution, the court in discrimination cases may not question the sincerity of a professed religious reason for her termination, but nevertheless may determine whether that reason is being advanced as a pretext for unlawful discrimination. See *Rweyemamu* v. *Cote*, supra, 520 F.3d 207; see also, e.g., *Redhead* v. *Conference of Seventh-Day Adventists*, supra, 566 F. Sup. 2d 137 (denying motion for summary judgment because "although . . . [the] plaintiff must concede both the existence of [the] defendant's policy and the genuineness of [the] defendant's belief in that policy, a jury remains the proper instrument for determining 'whether it was pregnancy or fornication that caused the [d]efendant to dismiss the [p]laintiff' "); *Redhead* v. *Conference of Seventh-Day Adventists*, supra, 138 (noting that multiple courts have not found that this inquiry will cause excessive entanglement).

[19] We note that the United States Supreme Court recently granted the defendant's petition for certiorari to appeal from the Sixth Circuit's decision in *Equal Employment Opportunity Commission* v. *Hosanna-Tabor Evangelical Lutheran Church & School*, supra, 597 F.3d 769, to resolve a circuit split as to the application of the primary duties test to nonordained employees. See *Equal Employment Opportunity Commission* v. *Hosanna-Tabor Evangelical Lutheran Church & School*, supra, 563 U.S. 903. The question presented is "whether the ministerial exception applies to a teacher at a religious elementary school who teaches the full secular curriculum, but also teaches daily religion classes, is a commissioned minister, and regularly leads students in prayer and worship." See Supreme Court Docket Search Page, available at http://www.supremecourt.gov/qp/10-00553qp.pdf (last visited July 22, 2011).

fact of his ordination"); see also *Alcazar* v. *Corp. of the Catholic Archbishop of Seattle*, 627 F.3d 1288, 1291 (9th Cir. 2010) (en banc) (noting lack of "uniform general test" but acknowledging that all circuits use variations of " 'primary duties' " test). Thus, an employee need not be ordained clergy to be subject to the ministerial exception, and as "a general rule . . . is considered a minister if the employee's primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship."[20] (Internal quotation marks omitted.) *Equal Employment Opportunity Commission* v. *Hosanna-Tabor Evangelical Lutheran Church & School*, supra, 778. Although the question of whether an employee's primary duties subject him to the ministerial exception generally presents an issue of fact requiring limited discovery and the trial court to conduct a trial type evidentiary hearing;[21] see, e.g., *Conboy* v. *State*, supra, 292 Conn. 654; it is undisputed for purposes of the present appeal that the plaintiff's duties as a Catholic school principal render her a ministerial employee.[22] See, e.g., *Pardue* v. *Center City*

---

[20] Because the plaintiff in *Rweyemamu* v. *Commission on Human Rights & Opportunities*, supra, 98 Conn. App. 655 and n.5, was a Roman Catholic priest, the Appellate Court did not need to consider whether the ministerial exception could be applied to nonordained employees.

[21] Compare *Equal Employment Opportunity Commission* v. *Hosanna-Tabor Evangelical Lutheran Church & School*, supra, 597 F.3d 772, 778–80 (trial court not clearly erroneous in concluding that parochial school teacher with title of "commissioned minister" is not subject to ministerial exception when she taught "primarily secular subjects," and was not required to be Lutheran in order to accomplish limited religious tasks), with *Weishuhn* v. *Catholic Diocese of Lansing*, 287 Mich. App. 211, 219, 787 N.W.2d 513 (finding "no error in the trial court's conclusion that [a Catholic schoolteacher's] duties were primarily religious, notwithstanding the fact that she taught four mathematics and two religion classes in her last year of teaching"), appeal denied, 488 Mich. 852, 787 N.W.2d 507 (2010).

[22] After they filed this appeal, the defendants moved to have the trial court articulate whether the plaintiff was a ministerial employee on the basis that the court's memorandum of decision was unclear as to that point. The plaintiff objected on the ground that the memorandum of decision was clear that the trial court deemed her to be a ministerial employee. The trial court

*Consortium Schools of the Archdiocese of Washington, Inc.*, supra, 875 A.2d 677 (describing Catholic school principal's "many responsibilities—some predominantly 'secular' and some predominantly religious," as "inextricably intertwined in the school's mission and in the principal's role in fulfilling it").

That the plaintiff is a ministerial employee for purposes of the present appeal does not, however, necessarily end our inquiry, because the parties' claims require us to address a split in the federal circuit courts of appeal as to the breadth of the ministerial exception that was not before the Appellate Court in *Rweyemamu* v. *Commission on Human Rights & Opportunities*, supra, 98 Conn. App. 646. Specifically, the plaintiff urges us to follow the approach taken by an emerging minority of circuits, including the Second Circuit in *Rweyemamu* v. *Cote*, supra, 520 F.3d 208, which considers the "nature of the dispute" in eschewing the categorical rejection of claims brought by ministerial employees. In adopting this more nuanced variant of the ministerial exception, the Second Circuit noted that, "although [the doctrine's] name might imply an absolute exception, it is not always a complete barrier to suit; for example, a case may proceed if it involves a limited inquiry that, combined with the ability of the district court to control discovery, can prevent a wide-ranging intrusion into sensitive religious matters." (Internal quotation marks omitted.) Id., 207. Citing tort and contract cases that did not implicate religious institutions' freedom to select their leaders, the court noted that, "however high in the church hierarchy he may be, a plaintiff alleging particular wrongs by the church that are *wholly [nonreligious] in character*

_____

denied the motion for articulation. At oral argument before this court, the plaintiff acknowledged that, although she had argued before the trial court that she was not a ministerial employee because her duties were primarily secular in nature, she has not challenged the trial court's apparent determination to the contrary in defending this appeal and, accordingly, has waived any such claim.

is surely not forbidden his day in court. The minister struck on the head by a falling gargoyle as he is about to enter the church may have an actionable claim." (Emphasis added.) Id., 208. The court further emphasized that the "salience" of the establishment clause concerns presented "where the state and church are pitted against one another in a protracted legal battle . . . depends upon the claim asserted by the plaintiff. . . . For instance . . . whatever their emblemata, some claims may inexorably entangle us in doctrinal disputes. . . . By contrast, if a plaintiff alleges, for instance, that his religious employer has deceived him within the meaning of a state's common law of fraud, his case is less likely to run afoul of the [e]stablishment [c]lause." (Citations omitted; internal quotation marks omitted.) Id., 208–209. Nevertheless, the court affirmed the judgment of dismissal because the plaintiff's complaint therein presented a simple racial discrimination claim that would have required the court, in connection with the standard pretext analysis applicable to such claims as set forth in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), to question the legitimacy of the church's evaluation of the plaintiff's performance of his pastoral duties. See *Rweyemamu* v. *Cote*, supra, 209.

The Third, Ninth and District of Columbia Circuit Courts of Appeals have taken approaches similar to that of the Second Circuit, and refrain from deciding only those cases that directly call into question the religious institution's hiring or termination decision. In *Petruska* v. *Gannon University*, supra, 462 F.3d 306 n.8, which the Second Circuit relied on in *Rweyemamu* v. *Cote*, supra, 520 F.3d 208, the Third Circuit emphasized that the ministerial exception "does not apply to *all* employment decisions by religious institutions, nor does it apply to *all* claims by ministers. It applies only to claims involving a religious institution's choice as

to who will perform spiritual functions." (Emphasis in original.) Thus, the Third Circuit upheld the dismissal of a Catholic university chaplain's claims challenging a restructuring that eliminated her position as a pretext for gender discrimination; id., 307–308; but would have permitted her to proceed with properly pleaded state law fraud claims alleging misrepresentations by her employer and state law breach of contract claims pertaining to the terms of her specific employment contract, reasoning that they "could be decided without wading into doctrinal waters." Id., 312. Similarly, in *Minker* v. *Baltimore Annual Conference of United Methodist Church*, supra, 894 F.2d 1360, the D.C. Circuit Court of Appeals concluded that the ministerial exception did not bar a plaintiff pastor's breach of contract action for money damages only because that issue "can be adduced by a fairly direct inquiry into whether [the plaintiff's] superintendent promised him a more suitable congregation, whether [the plaintiff] gave consideration in exchange for that promise, and whether such congregations became available but were not offered to [the plaintiff]."

The United States Court of Appeals for the Ninth Circuit utilized a similar analysis in *Elvig* v. *Calvin Presbyterian Church*, 375 F.3d 951, 965–67 (9th Cir. 2004), which followed its decision in *Bollard* v. *California Province of the Society of Jesus*, supra, 196 F.3d 940, and concluded that a minister who had raised retaliation and hostile work environment claims against his church under Title VII could proceed in an action limited to damages for emotional distress and reputational harm arising from acts of harassment and verbal intimidation, but could not recover any damages arising from the church's protected actions of modifying her duties, and suspending and terminating her employment. The court found "no [f]irst [a]mendment basis for shielding the [c]hurch from its obligation to protect its employees from harassment when extending such protection

would not contravene the [c]hurch's doctrinal preroga-
tives or trench upon its protected ministerial decisions."
*Elvig* v. *Calvin Presbyterian Church*, supra, 964.

In contrast to this issue sensitive approach, the defen-
dants urge us to follow the analysis followed by, inter
alia, the United States Court of Appeals for the Seventh
Circuit in declining to consider a claim for damages
arising from harassment, under which the " 'ministerial
exception' applies without regard to the type of claims
being brought." *Alicea-Hernandez* v. *Catholic Bishop
of Chicago*, supra, 320 F.3d 703. Courts following this
categorical approach criticize the analysis followed by
the Second and Ninth Circuits as unclear and subject
to "arbitrary and confusing application . . . ." *Skrzyp-
czak* v. *Roman Catholic Diocese of Tulsa*, 611 F.3d 1238,
1245 (10th Cir. 2010). In concluding that the ministerial
exception bars hostile work environment claims
brought by ministers under Title VII, the Tenth Circuit
held in *Skrzypczak* that the ministerial exception barred
actions under both Title VII and the Equal Pay Act of
1963 on the ground that adjudication would improperly
interfere with the church's right to select and direct its
ministers free from state interference. Id., 1246; see
also, e.g., *Gellington* v. *Christian Methodist Episcopal
Church, Inc.*, 203 F.3d 1299, 1301, 1304 (11th Cir. 2000)
(ministerial exception barred minister's Title VII claims
of constructive discharge caused by 800 mile transfer
and salary reduction after he aided another minister in
lodging sexual harassment complaint).

In considering this circuit split, we note that it is well
settled that decisions of the Second Circuit, while not
binding upon this court, nevertheless "carry particularly
persuasive weight" in the resolution of issues of federal
law when the United States Supreme Court has not
spoken on the point. See *Szewczyk* v. *Dept. of Social
Services*, 275 Conn. 464, 475, 881 A.2d 259 (2005) (statu-
tory interpretation); *Schnabel* v. *Tyler*, 230 Conn. 735,

742–43, 646 A.2d 152 (1994) (qualified immunity under 42 U.S.C. § 1983). This is particularly so given the existence of a circuit split, because "[d]eparture from Second Circuit precedent on issues of federal law . . . should be constrained in order to prevent the plaintiff's decision to file an action in federal District Court rather than a state court located a few blocks away from having the bizarre consequence of being outcome determinative." (Internal quotation marks omitted.) *Szewczyk* v. *Dept. of Social Services*, supra, 475 n.11.

Thus, we adopt the standard articulated by the Second Circuit in *Rweyemamu* v. *Cote*, supra, 520 F.3d 208–209,[23] and conclude that, in an employment related action against a religious institution, even if it is established that the plaintiff's primary duties render him a ministerial employee; see footnotes 18 through 22 of this opinion and the accompanying text; Connecticut courts must consider whether adjudicating the particular claims and defenses in the case would require the court to intrude into a religious institution's exclusive right to decide matters pertaining to doctrine or its internal governance or organization.[24] See *Barton* v.

---

[23] We also note that the Second Circuit's approach to the ministerial exception has found academic support as "strik[ing] the right balance between the two societal values at stake by precluding suit only where a [f]irst [a]mendment violation is unavoidable and holding religious employers accountable for their discriminatory employment actions absent evidence of a religious motivation." J. Vartanian, note, "Confessions of the Church: Discriminatory Practices by Religious Employers and Justifications for a More Narrow Ministerial Exception," 40 U. Tol. L. Rev. 1049, 1073 (2009); see also id., 1074 (noting that "dismissal will often be appropriate" under Second Circuit's approach and that "if courts are up to the task of applying a more careful analysis dependent on the type of claim asserted, they may provide relief to a few more victims of discrimination, a result that is a far cry from insignificant").

[24] In making this determination, the court should also consider, as a prudential matter that is a corollary to the substance of the claims in the case, the nature and extent of the discovery that it can permit and control, in order to "prevent a wide-ranging intrusion into sensitive religious matters." (Internal quotation marks omitted.) *Rweyemamu* v. *Cote*, supra, 520 F.3d 207.

*MikelHayes*, United States District Court, Docket No. 09-CV-0063, 2010 U.S. Dist. LEXIS 107233, *11 (N.D.N.Y. October 7, 2010) (The court dismissed a minister's claims of discrimination and retaliation because "the [c]ourt would be forced to question the [c]hurch's administration in order to decide whether [the] [p]laintiff's pastoral license was revoked due to his violation of the United Methodist Church's governing doctrine, as [the] [d]efendant claims, or whether the [d]efendant's reasons for deciding that [the] [p]laintiff violated the doctrine were actually 'not only erroneous, but also pretextual' as [the] [p]laintiff claims. This question cannot not be answered by the [c]ourt without impermissible entanglement with the United Methodist Church's religious doctrine."); *Friedlander* v. *Port Jewish Center*, supra, 588 F. Sup. 2d 431 (declining to consider breach of contract claim challenging termination of rabbi's employment because "adjudicating the [p]laintiff's claim would . . . necessarily require the [c]ourt to review the [p]laintiff's performance of her rabbinical duties"); *Rojas* v. *Roman Catholic Diocese of Rochester*, supra, 557 F. Sup. 2d 398–99 (denying motion to dismiss termination claim because court could not "determine whether the dispute is religious in nature" based on state of record, and declining to dismiss hostile work environment claim because "[the] [d]efendants do not claim that the alleged harassment had anything to do with the religious doctrine of the Catholic Church").

Applying this standard to the claims raised in the complaint in this case, we first conclude that counts one and two, alleging breach of implied contract and the implied covenant of good faith and fair dealing, are barred by the ministerial exception. The plaintiff claims that the archdiocese's own policies, procedures and practices with respect to performance evaluations; see footnote 3 of this opinion; created an implied contract that bound the archdiocese, and Bzdyra as the plaintiff's

supervisor, to provide the plaintiff with an opportunity to improve her job performance prior to terminating her employment or not renewing her contract. Although the plaintiff seeks only money damages, rather than reinstatement, her claim essentially asks the court to police the archdiocese's compliance with its own internal procedures. Even those courts that have found justiciable other claims in connection with a ministerial employee's termination have held that the ministerial exception bars claims that a religious institution failed to follow its own procedures and bylaws in terminating a religious employee. See *Drevlow* v. *Lutheran Church, Missouri Synod*, 991 F.2d 468, 470–72 (8th Cir. 1993) (declining to review claim that church failed to follow its own bylaws by removing plaintiff from list of eligible ministers, but permitting plaintiff to proceed with libel claim that church told affiliates his spouse was divorced, which was violation of church policy); *Pierce* v. *Iowa-Missouri Conference of Seventh-Day Adventists*, 534 N.W.2d 425, 427 (Iowa 1995) (declining to consider minister's claim that church failed to follow its own procedures in failing to counsel him before termination because that went to heart of termination action), cert. denied, 517 U.S. 1220, 116 S. Ct. 1847, 134 L. Ed. 2d 948 (1996); *Music* v. *United Methodist Church*, 864 S.W.2d 286, 290 (Ky. 1993) (declining to consider minister's claim that church failed to follow counseling and termination procedures set forth in Methodist Book of Discipline); *Callahan* v. *First Congregational Church of Haverhill*, 441 Mass. 699, 712–14, 808 N.E.2d 301 (2004) (applying ministerial exception to contract, tortious interference and emotional distress claims that "[arise] not from any purported violation of the written contract between [the pastor] and the [c]hurch, but from the defendants' alleged failure to follow their own written procedures in carrying out the investigation and disciplinary proceedings"); cf. *Minker* v. *Baltimore*

*Annual Conference of United Methodist Church,* supra, 894 F.2d 1359 (applying ministerial exception to breach of contract claim based on antidiscrimination provision in Methodist Book of Discipline because that would "necessarily [involve] interpretation of the minister's occupational qualifications which requires an 'understanding of the genuine desire to embody and carry forth more effectively Christ's ministry' ").

Turning to the third count of the complaint, promissory estoppel, the plaintiff claims that she relied to her detriment on Bzdyra's clear and unambiguous oral and written promises to allow her to evaluate her own performance and improve during the 2004–2005 school year, and to meet with her to discuss changes in her administration of the school. We conclude that this claim is barred by the ministerial exception because, like the implied contract claims, it is founded on a lack of compliance with the archdiocese's personnel evaluation policies and procedures. If, as previously noted, the ministerial exception operates as a constitutional bar to claims sounding in contract based on the failure of a religious institution to follow its own procedures and bylaws in terminating a ministerial employee; see, e.g., *Drevlow* v. *Lutheran Church, Missouri Synod,* supra, 991 F.2d 470–72; then logical consistency demands that the exception similarly must bar a promissory estoppel claim arising on that same factual basis because that doctrine simply is an alternative to contractual liability for cases with reasonable reliance by a third party or promisee "despite the absence of common-law consideration normally required to bind a promisor." (Internal quotation marks omitted.) *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School,* 202 Conn. 206, 213, 520 A.2d 217 (1987); see also, e.g., *Glazer* v. *Dress Barn, Inc.,* 274 Conn. 33, 88, 873 A.2d 929 (2005) ("[p]romissory estoppel is asserted when there is an absence of consideration to support

a contract"). Thus, we conclude that the trial court improperly determined that the plaintiff's promissory estoppel claims were not barred by the ministerial exception.[25]

Turning to the fourth, fifth and sixth counts, wrongful termination in violation of public policy, negligent inflic-

[25] We disagree with the plaintiff's reliance on the conclusions of the United States Court of Appeals for the District of Columbia Circuit in *Minker* v. *Baltimore Annual Conference of United Methodist Church*, supra, 894 F.2d 1354, and the Third Circuit in *Petruska* v. *Gannon University*, supra, 462 F.3d 307, and *Geary* v. *Visitation of the Blessed Virgin Mary Parish School*, 7 F.3d 324, 329 (3d Cir. 1993). We note at the outset that *Geary* is inapposite because it is not a ministerial exception case; rather, it concerned only the applicability of the Age Discrimination in Employment Act, 29 U.S.C § 623 et seq., to the employment relationship between a parochial school and a lay teacher. *Geary* v. *Visitation of the Blessed Virgin Mary Parish School*, supra, 325.

In *Minker* v. *Baltimore Annual Conference of United Methodist Church*, supra, 894 F.2d 1359, the District of Columbia Circuit Court of Appeals concluded in part that the ministerial exception did not bar a pastor's action for breach of an oral employment contract, assuming the truth of his allegation "that the district superintendent did in fact promise to provide [the pastor] with a congregation more suited to his training and skills in exchange for his continued work at the Mount Rainier Church . . . [which] clearly would create a contractual relationship." The court emphasized that "[a] church is always free to burden its activities voluntarily through contracts, and such contracts are fully enforceable in civil court"; id.; and rejected the church's claim that "even proving the existence of a contract in this case would require the sort of inquiry into subjective, spiritual, and ecclesiastical matters that the first amendment prohibits," and would result in entanglement via the discovery and trial process. Id., 1359–60. The court held that "the first amendment does not immunize the church from all temporal claims made against it," and that the pastor "should be allowed to demonstrate that he can prove his case without resorting to impermissible avenues of discovery or remedies," given that, "[a]s a theoretical matter, the issue of breach of contract can be adduced by a fairly direct inquiry" into whether the superintendent had made the claimed promises. Id., 1360. Similarly, in *Petruska* v. *Gannon University*, supra, 462 F.3d 307, the Third Circuit concluded that the ministerial exception barred a university chaplain's claims of Title VII discrimination and retaliation, civil conspiracy and negligent supervision, but not her claims for fraudulent misrepresentation or breach of contract arising from a clause in her employment contract that specifically entitled her to participate on the university president's staff. See also id., 309–310 (dismissing civil conspiracy and negligent supervision claims "[b]ecause the [f]irst [a]mendment protects [the university's] right to restructure—regardless of its reason for doing so—we cannot consider

tion of emotional distress and tortious interference with business expectancies, respectively, we conclude that these claims are barred by the ministerial exception. These claims arise directly from, and in furtherance of, the defendants' decision to terminate the employment of the plaintiff—a ministerial employee—and requiring the court to determine whether any proffered religious reasons are a pretext for unlawful action would amount to judging the employment decisions of the church.[26] See *Rweyemamu* v. *Cote,* supra, 520 F.3d 208–209 (The court dismissed a racial discrimination claim under the ministerial exception because deciding it would have required the court, in connection with standard pretext analysis, to "gainsay the Congregatio Pro Clericis' conclusion that [the plaintiff priest] is insufficiently devoted

---

whether the act was unlawful or tortious," but also that "the resolution of [the chaplain's] fraudulent misrepresentation claim does not turn on the lawfulness of the decision to restructure, but rather upon the truth or falsity of the assurances that she would be evaluated on her merits when she was initially appointed as University Chaplain in July of 1999"). *Minker* and *Petruska* are, therefore, distinguishable from the present case because they concerned breaches of distinctly bargained-for contractual arrangements, and did not arise implicitly from the religious institutions' internal operating rules. Cf. *Callahan* v. *First Congregational Church of Haverhill,* supra, 441 Mass. 712–14 (noting distinction between religious institution's specific written contractual obligations and failure to follow generally applicable disciplinary procedures); *Mundie* v. *Christ United Church of Christ,* 987 A.2d 794, 797, 801 (Pa. Super. 2009) (pastor's breach of contract claim seeking only money damages for breach of retirement and compensation contract clauses not subject to ministerial exception because "this case initially turns upon whether a contract existed at all and not the predicate for the termination; an issue that requires no doctrinal exegesis"), appeal denied, 14 A.3d 829 (Pa. 2010).

[26] Moreover, the plaintiff's wrongful discharge claim, while disturbing in nature, may well not be legally sufficient under *Sheets* v. *Teddy's Frosty Foods, Inc.,* 179 Conn. 471, 427 A.2d 385 (1980), given that she was not discharged from at will employment but, rather, was employed pursuant to a term contract of fixed duration. See *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School,* supra, 202 Conn. 211 n.1 (The court noted that "the right to recover in tort for wrongful discharge extends only to employees at will" and "[t]he plaintiff in this case, who was employed by the defendants pursuant to a term contract of fixed duration, was not an employee at will. She therefore was not entitled to invoke the doctrine of wrongful discharge.").

to ministry? How are we to assess the quality of his homilies?"); see also *Van Osdol* v. *Vogt*, 908 P.2d 1122, 1126 n.6 (Colo. 1996) (The court noted that the plaintiff's "claims of intentional interference with contract, interference with prospective economic advantage, and breach of fiduciary duty all relate directly to [the church's] choice of a minister. . . . For a court to determine whether the defendants impermissibly caused [the] plaintiff damage would require the court to examine the reasoning behind [the church's] choice of a minister."); *Archdiocese of Miami, Inc.* v. *Minagorri*, 954 So. 2d 640, 642–44 (Fla. Dist. App. 2007) (ministerial exception requires dismissal of Catholic school principal's whistleblower and retaliation claims seeking damages and reinstatement when she was terminated for complaining to archdiocese after parish priest grabbed and threatened her), appeal dismissed, 985 So. 2d 1086 (Fla. 2008), cert. denied, 555 U.S. 1102, 129 S. Ct. 936, 173 L. Ed. 2d 113 (2009); *Callahan* v. *First Congregational Church of Haverhill*, supra, 441 Mass. 712–14 (ministerial exception bars tortious interference and emotional distress claims that arose from "defendants' alleged failure to follow their own written procedures in carrying out the investigation and disciplinary proceedings"); *Weishuhn* v. *Catholic Diocese of Lansing*, 287 Mich. App. 211, 225, 787 N.W.2d 513 ("We recognize that it seems unjust that employees of religious institutions can be fired without recourse for reporting illegal activities, particularly given that members of the clergy, as well as teachers, are mandated reporters. . . . However, to conclude otherwise would result in pervasive violations of [f]irst [a]mendment protections." [Citation omitted.]), appeal denied, 488 Mich. 852, 787 N.W.2d 507 (2010).

The judgment is reversed and the case is remanded with direction to render judgment dismissing the plaintiff's complaint.

In this opinion the other justices concurred.