******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander, Prescott Js.*

This court, having requested briefing from the parties on the issue of whether there was a final judgment for purposes of appellate jurisdiction by order dated July 20, 2022, it is hereby ordered that the trial court's denial of the defendants' special motion to dismiss, filed pursuant to General Statutes § 52-196a, constitutes a final judgment under the second prong of *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983), and the defendants' appeal is transferred to the Appellate Court for further proceedings according to law.

May 2, 2023

ROBINSON, C. J. In this appeal, we must consider whether Connecticut's appellate courts have jurisdiction over an interlocutory appeal from a trial court's denial of a special motion to dismiss filed pursuant to our anti-SLAPP[1] statute, General Statutes § 52-196a.[2] The defendants, Aaron Supple, Karen Montejo, Hendrick Xiong-Calmes, and Gianna Moreno, who were students at Trinity College in Hartford (Trinity), appealed to the Appellate Court from the trial court's denial of their special motion to dismiss the action brought against them by the plaintiffs, Gregory B. Smith, Nicholas Engstrom, and The Churchill Institute, Inc. (Churchill Institute).[3] Thereafter, this court transferred the appeal to itself and ordered the parties, sua sponte, to brief the issue of whether the trial court's denial of the special motion to dismiss constitutes a final judgment for the purpose of an appeal. On that limited issue, the defendants argue that the trial court's denial is immediately appealable under the second prong of *State* v. *Curcio*, 191 Conn. 27, 31, 463 A.2d 566 (1983). For the reasons that follow, we agree with the defendants and conclude that the denial of a special motion to dismiss based on a colorable claim of a right to avoid litigation under § 52-196a is an appealable final judgment under the second prong of *Curcio*. Because the defendants' appeal presents such a colorable claim, we transfer the appeal back to the Appellate Court for further proceedings according to law.

The record reveals the following relevant facts and

procedural history, which are undisputed for purposes of the present appeal. Smith is a professor of political science and philosophy at Trinity. Acting in his capacity as a professor at Trinity, Smith circulated a letter to his fellow faculty and colleagues entitled "Reflections on the 'Campus Climate.'" The letter criticized Trinity's policies, which Smith believed constituted a "new segregation . . . ." Smith wrote in relevant part: "We are creating a new form of racism and classism at Trinity—with a new form of original sin being loaded on white, suburban students—and it is no accident that this occurs as the aftermath of transforming the center of the curriculum and hiring into a focus on the mantra of [r]ace, [c]lass and [g]ender as if there were nothing else of interest in the life of the mind." Smith went on to refer to Trinity's "'cultural houses'" as "tribal enclaves," opining that "[h]ouses that integrate students by interest and academic subject matter would be far more promising than tribal enclaves that lead to division and hostility that need not exist. We are creating a climate of armed camps, not one of open, urbane and cosmopolitan civility. What happened to the premise in [*Brown* v. *Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954)] that separate is never equal? What happened to Martin Luther [King, Jr.'s] 'dream' of getting past the surface to treating each person as an individual and an equal rather than as members of groups?"[4] Although Smith sent his letter to his fellow faculty members, the defendants and other students received access to it in March, 2019.

In the spring of 2019, several undergraduate students at Trinity, including Engstrom, created the Churchill Club (club) and applied for formal recognition and funding from Trinity's Student Government Association (SGA). Smith served as the faculty advisor to the club. The club was "inspired" in part by the Churchill Institute, which is a nonprofit corporation founded by Smith that "focuses on the study of Western civilization, philosophy, and tradition," and certain reading groups that Smith had organized. In connection with the club's application for formal recognition, the club's student representatives, led by Engstrom, appeared before the SGA on March 3, 2019, to answer questions. Student protestors also attended the hearing to protest against the club's formal recognition. The SGA continued the vote on whether to formally recognize the club and subsequently announced that a pair of "'drop-in student town halls'" would take place on April 10 and 11, 2019.

On April 1, 2019, a Trinity student newspaper published its annual satirical issue. The issue featured an

article entitled "SGA Considers Fascist Society Approval," referencing the campus controversy over the club's application for recognition. Around April 10, 2019, the defendants posted flyers around campus, featuring the Churchill Institute's logo, a photograph of Smith, and a quote from a Facebook post authored by Smith: "the new racism is every bit as ugly as the old."[5] The defendants also posted nearly identical flyers featuring a photograph of Engstrom.

Thereafter, the plaintiffs brought the present action against the defendants, alleging libel per se, libel per quod, and negligent infliction of emotional distress. The defendants filed a special motion to dismiss under the anti-SLAPP statute, § 52-196a, arguing that the plaintiffs' claims were based on the defendants' exercise of their right of free speech and their right of association in connection with a matter of public concern under the first amendment to the United States constitution. The plaintiffs objected to the defendants' special motion to dismiss.

The trial court denied the defendants' special motion to dismiss on November 16, 2021. The court noted that, in deciding a special motion to dismiss under § 52-196a (e) (3), Connecticut courts must undertake a two-pronged, burden shifting analysis. See footnote 2 of this opinion. The court found that the defendants had failed to meet their burden under § 52-196a (e) (3) with respect to their claim of free speech because their communications at Trinity were not made in a "public forum," as required by § 52-196a (a) (2).[6] The court further concluded that a private college, like Trinity, was not a state actor for purposes of triggering first amendment protections under the United States constitution.[7]

As to the defendant's right of association claim,[8] the trial court noted that the "United States Supreme Court has afforded constitutional protection to freedom of association in two distinct senses. First, the [c]ourt has held that the [c]onstitution protects against unjustified government interference with an individual's choice to enter into and maintain certain intimate or private relationships. Second, the [c]ourt has upheld the freedom of individuals to associate for the purpose of engaging in protected speech or religious activities." (Internal quotation marks omitted.) The trial court determined that the defendants' conduct, and the lawsuit that ensued, did "not involve any governmental interference with the defendants' choice to enter into and maintain intimate or private relationships." The court further determined that the defendants' conduct did not consti-

tute engagement in protected speech under the first amendment because Trinity was not a public forum. Accordingly, the court concluded that the defendants had also failed to meet their initial burden under § 52-196a (e) (3) on the ground that the plaintiffs' complaint was based on their right of association.[9]

The defendants appealed from the trial court's denial of their special motion to dismiss to the Appellate Court. Shortly after the parties filed their preliminary statement of the issues, the Appellate Court sua sponte stayed the appeal pending this court's decision in *Pryor* v. *Brignole*, 346 Conn. 534,     A.3d     (2023). Thereafter, we transferred this appeal to our docket pursuant to Practice Book § 65-1 and instructed the parties, sua sponte, to brief "only the threshold jurisdictional issue of whether the denial of a special motion to dismiss filed pursuant to  . . .  § 52-196a is an appealable final judgment  . . . ."

Before this court, the defendants argue that an appealable final judgment exists under the general appellate jurisdiction statute, General Statutes § 52-263,[10] as explicated by the second prong of *State* v. *Curcio*, supra, 191 Conn. 31, because an interlocutory appeal is necessary to protect the statutory right to the dismissal of a SLAPP suit. The defendants first look to the text of § 52-196a (d), which provides in relevant part that any stay of discovery imposed upon the filing of a special motion to dismiss "shall remain in effect until the court grants or denies the special motion to dismiss *and any interlocutory appeal thereof*. . . ." (Emphasis added.) Although the defendants concede that this language does not expressly create appellate jurisdiction, they argue that the reference to "interlocutory appeal[s]" suggests that the legislature understood that the right at issue in the statute would satisfy *Curcio*. In further support of this claim, the defendants also rely on the purpose of the statute as explained in the legislative history, namely, to provide a rapid mechanism by which defendants could avert SLAPP suits—which are by definition frivolous lawsuits intended to punish or deter the otherwise legitimate exercise of first amendment rights. In emphasizing that Connecticut's anti-SLAPP statute provides a right to avoid litigation, the defendants likewise rely on a variety of federal and sister state cases in arguing that the protections afforded by the anti-SLAPP statute would be irrevocably lost by virtue of having to litigate a putative SLAPP suit to conclusion following a trial court's erroneous denial of a special motion to dismiss.

The plaintiffs contend in response that the denial of

a special motion to dismiss is not an appealable final judgment. The plaintiffs argue that, had the legislature intended such denials to be immediately appealable, it would have used specific language in the statute to bestow that right. The plaintiffs also argue that the reference in § 52-196a (d) to an "interlocutory appeal" was not intended to make the denial of a special motion to dismiss immediately appealable in and of itself but, instead, merely contemplated other forms of interlocutory appeals not requiring a final judgment, such as public interest appeals by application to the Chief Justice under General Statutes § 52-265a. They further posit that the legislative history of the anti-SLAPP statute is devoid of any reference to the provision of an interlocutory appeal. The plaintiffs also argue that anti-SLAPP protection is not subject to vindication by interlocutory appeal under the second prong of *Curcio* because it is simply a procedure, akin to a motion for summary judgment, and not itself an independent substantive right. In particular, the plaintiffs contend that the anti-SLAPP statute was created to short-circuit litigation and that a statutory procedure to truncate litigation does not itself constitute an independent right. Finally, they argue that allowing an appeal would open the floodgates to interlocutory appeals, which would be at odds with our final judgment jurisprudence. We, however, agree with the defendants and conclude that the denial of a special motion to dismiss based on a colorable claim of a right to avoid litigation under § 52-196a is an immediately appealable final judgment under the second prong of *Curcio*.

"The lack of a final judgment implicates the subject matter jurisdiction of an appellate court to hear an appeal. A determination regarding . . . subject matter jurisdiction is a question of law [over which we exercise plenary review]." (Internal quotation marks omitted.) *Brown & Brown, Inc.* v. *Blumenthal*, 288 Conn. 646, 651–52, 954 A.2d 816 (2008). "We commence the discussion of our appellate jurisdiction by recognizing that there is no constitutional right to an appeal. . . . Article fifth, § 1, of the Connecticut constitution provides for a Supreme Court, a Superior Court and such lower courts as the [G]eneral [A]ssembly shall . . . ordain and establish, and that [t]he powers and jurisdiction of these courts *shall be defined by law.* . . . To consider the [defendants'] claims, we must apply the law governing our appellate jurisdiction, which is statutory. . . . The legislature has enacted . . . § 52-263, which limits the right of appeal to those appeals filed by aggrieved parties on issues of law from final judgments. Unless a specific right to appeal otherwise has been provided

by statute, we must always determine the threshold question of whether the appeal is taken from a final judgment before considering the merits of the claim. . . . Further, we have recognized that limiting appeals to final judgments serves the important public policy of minimizing interference with and delay in the resolution of trial court proceedings." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) Id., 652–53.

Thus, "[a]s a general rule, an interlocutory ruling may not be appealed pending the final disposition of a case." (Internal quotation marks omitted.) *Sena* v. *American Medical Response of Connecticut, Inc.*, 333 Conn. 30, 41, 213 A.3d 1110 (2019). In determining whether a judgment or a ruling is an immediately appealable final judgment, courts have routinely looked to a statute's text to see if the legislature has provided an express right to appeal. See General Statutes § 1-2z. In those instances that the legislature has not provided such an express right, our courts then continue to consider whether the right at issue implicates one of the two prongs set forth in *State* v. *Curcio*, supra, 191 Conn. 31. See *Blakely* v. *Danbury Hospital*, 323 Conn. 741, 745, 150 A.3d 1109 (2016) ("[T]he subject matter jurisdiction of our appellate courts is limited by statute to appeals from final judgments . . . . [However], the courts may deem interlocutory orders or rulings to have the attributes of a final judgment if they fit within either of the two prongs of the test set forth in [*Curcio*]." (Internal quotation marks omitted.)).

We begin by observing that § 52-196a does not expressly authorize an interlocutory appeal from a trial court's denial of a special motion to dismiss. The single subsection of that statute referencing interlocutory appeals, as we noted previously in this opinion, provides in relevant part: "The court shall stay all discovery upon the filing of a special motion to dismiss. The stay of discovery shall remain in effect *until the court grants or denies the special motion to dismiss and any interlocutory appeal thereof. . . .*" (Emphasis added.) General Statutes § 52-196a (d). The defendants concede, and we agree, that this isolated reference to an interlocutory appeal does not rise to the level of specificity required for an independent grant of appellate jurisdiction. Cf. General Statutes § 31-118 ("[w]hen any court or a judge thereof issues or denies a temporary injunction in a case involving or growing out of a labor dispute and either party is aggrieved . . . he may appeal from the final judgment of the court or of such judge to the Appellate Court at any time within two weeks of . . .

such judgment"); General Statutes § 42-110h (order granting or denying class certification for class actions brought under Connecticut Unfair Trade Practices Act "shall be immediately appealable by either party"); General Statutes § 52-278*l* (a) (1) ("[a]n order . . . granting or denying a prejudgment remedy . . . shall be deemed a final judgment for purposes of appeal"); General Statutes § 54-63g (aggrieved accused person or state "may petition the Appellate Court for review of [an] order [concerning release]").

The text and legislative history of § 52-196a, however, also do not in any way suggest that the legislature intended to *preclude* interlocutory appeals from denials of special motions to dismiss. See, e.g., *In re Tyriq T.*, 313 Conn. 99, 112–14, 96 A.3d 494 (2014) (examining legislative history and genealogy of General Statutes § 46b-127, and concluding that "the intent of the legislature [was] to prohibit an immediate appeal of a discretionary transfer order" from juvenile matters docket to regular criminal docket). As the plaintiffs argue, on the one hand, the reference in § 52-196a (d) to an "interlocutory appeal" very well could be a reference to a public interest appeal by application to the Chief Justice pursuant to § 52-265a, which does not require a final judgment. See, e.g., *Halladay* v. *Commissioner of Correction*, 340 Conn. 52, 67, 262 A.3d 823 (2021). The defendants suggest, on the other hand, that this language may also be an indirect reference to the availability of interlocutory review under *State* v. *Curcio*, supra, 191 Conn. 31. Either way, the fact that the legislature expressly provided for a stay of discovery during the pendency of an interlocutory appeal provides us with good reason to believe that the legislature, at the very least, did not intend to foreclose such review.

The absence of language expressly providing the defendants with a right to an interlocutory appeal does not, however, answer the question of whether a trial court's denial of a special motion to dismiss can nonetheless constitute an appealable final judgment. Indeed, it is well established that, "[a]lthough the legislature is free to make it clear in the language of a statute that an immediate appeal may be taken from an order of the court, the absence of such language is not determinative of whether such a right exists. . . . Rather, we presume that the legislature is aware of our [long-standing] final judgment jurisprudence. . . . Consequently, unless the legislature has made its intent clear regarding the appealability of an interlocutory order under a particular statute, our determination of whether that order is immediately appealable hinges on whether the order

meets the test articulated in *Curcio*." (Citations omitted.) *Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.*, 279 Conn. 220, 238, 901 A.2d 1164 (2006); cf. *In re Tyriq T.*, supra, 313 Conn. 103 n.4 (declining to consider whether discretionary transfer orders are appealable final judgments under *Curcio* given that "the legislature has manifested a clear intent to prohibit interlocutory appeals" from such orders).

"We previously have determined . . . that certain interlocutory orders have the attributes of a final judgment and consequently are appealable under . . . § 52-263. . . . In *State* v. *Curcio*, [supra, 191 Conn. 31], we explicated two situations in which a party can appeal an otherwise interlocutory order: (1) [when] the order or action terminates a separate and distinct proceeding, or (2) [when] the order or action so concludes the rights of the parties that further proceedings cannot affect them. . . .

"The second prong of the *Curcio* test focuses on the nature of the right involved. It requires the parties seeking to appeal to establish that the trial court's order threatens the preservation of a right already secured to them and that that right will be irretrievably lost and the [party] irreparably harmed unless they may immediately appeal. . . . Thus, a bald assertion that the defendant will be irreparably harmed if appellate review is delayed until final adjudication . . . is insufficient to make an otherwise interlocutory order a final judgment. One must make at least a colorable claim that some recognized statutory or constitutional right is at risk." (Footnote omitted; internal quotation marks omitted.) *Sena* v. *American Medical Response of Connecticut, Inc.*, supra, 333 Conn. 41.

Our case law establishes that "[t]he key to appellate jurisdiction under the second prong of *Curcio* is not so much that the right is already secured to a party; indeed, what is at issue in an appeal is the effect of the challenged order on the scope of the claimed right at issue. Rather, the second prong of *Curcio* boils down to whether, as a practical and policy matter, not allowing an immediate appeal will create irreparable harm insofar as allowing the litigation to proceed before the trial court will—in and of itself—function to deprive a party of that right." *Halladay* v. *Commissioner of Correction*, supra, 340 Conn. 62–63; see *Blakely* v. *Danbury Hospital*, supra, 323 Conn. 746 ("[t]he rationale for immediate appellate review is that the essence of the protection of immunity from suit is an entitlement not to stand trial or face the other burdens of litigation" (internal quotation marks omitted)).

Our recent decision in *Halladay* surveyed our final judgment case law under the second prong of *Curcio*. "Paradigmatic examples of such rights that require immediate vindication via an interlocutory appeal are double jeopardy violations resulting in successive prosecutions; see, e.g., *State* v. *Crawford*, 257 Conn. 769, 777, 778 A.2d 947 (2001), cert. denied, 534 U.S. 1138, 122 S. Ct. 1086, 151 L. Ed. 2d 985 (2002); collateral estoppel and res judicata; see, e.g., *Lighthouse Landings, Inc.* v. *Connecticut Light & Power Co.*, 300 Conn. 325, 328 n.3, 15 A.3d 601 (2011); and various immunities from suit. See, e.g., *Chadha* v. *Charlotte Hungerford Hospital*, 272 Conn. 776, 787, 865 A.2d 1163 (2005) (absolute immunity for statements made in judicial and quasi-judicial proceedings); *Shay* v. *Rossi*, 253 Conn. 134, 166, 749 A.2d 1147 (2000) (colorable claim to state's sovereign immunity is appealable final judgment because that 'doctrine protects against suit as well as liability— in effect, against having to litigate at all'), overruled in part on other grounds by *Miller* v. *Egan*, 265 Conn. 301, 828 A.2d 549 (2003); see also *Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.*, supra, [279 Conn.] 233–34 (denial of motion for prepleading security by unauthorized insurer pursuant to General Statutes § 38a-27 (a) is appealable under second prong of *Curcio* because, 'once the trial has concluded, the court will be unable to restore to the plaintiffs either their right to have the defendants post security or their right to obtain a default judgment against the defendants') . . . ." (Citation omitted.) *Halladay* v. *Commissioner of Correction*, supra, 340 Conn. 63–64; see *Sena* v. *American Medical Response of Connecticut, Inc.*, supra, 333 Conn. 52 (legislature intended protections under state of emergency statute, General Statutes § 28-13, to provide political subdivisions of state with "immunity from suit and not just immunity from liability," thereby rendering denial of motion for summary judgment appealable final judgment).

The defendants contend that § 52-196a confers a right independent of the first amendment itself, namely, a right to avoid the costly and onerous litigation process altogether as a consequence of the exercise of their first amendment rights.[11] In considering the nature of the right conferred by the anti-SLAPP statute for final judgment purposes, we find particularly instructive the legislative history of § 52-196a. See, e.g., *U.S. Bank National Assn.* v. *Crawford*, 333 Conn. 731, 733–34, 743, 219 A.3d 744 (2019) (considering whether issue was matter of public importance in determining whether denial of foreclosure committee's motion for fees and

expenses because of automatic bankruptcy stay was immediately appealable); see also *Lafferty* v. *Jones*, 336 Conn. 332, 382 n.36, 246 A.3d 429 (2020) (purpose of § 52-196a is "instructive" in determining scope of trial court's discretion to order limited discovery in connection with special motion to dismiss), cert. denied, U.S. , 141 S. Ct. 2467, 209 L. Ed. 2d 529 (2021).

Then Representative William Tong, the sponsor of the bill in the House of Representatives that became § 52-196a, explained that the anti-SLAPP[12] statute was intended to address "situations in which people have spoken out on matters of public concern including the press and we've seen situations [in which] people file litigation. *There appears to be no basis to that litigation but it's designed to chill free speech and the expression of constitutional rights and so this* [*legislation*] *provides for a special motion to dismiss so that early in the process somebody who's speaking and exercis*[*ing*] [*his or her*] *constitutional rights can try to dismiss a frivolous or abusive claim that has no merit and* [*short-circuit*] *a litigation* [*when*] *it might otherwise cost a great deal of money to continue to prosecute.* We think it's an important measure . . . to promote free speech and reporting by our news organizations as well."[13] (Emphasis added.) 60 H.R. Proc., Pt. 16, 2017 Sess., pp. 6879–80; see id., p. 6884, remarks of Representative Tong (describing "a significant amount of resources" expended by local news organization to defend against frivolous defamation actions); id., pp. 6924–25, remarks of Representative Tong (describing anti-SLAPP statute as "focused on this phenomenon of fake news or alternative facts" and ensuring that "no person, no developer, no interest group, [and] no private party that has substantial resources [is] able to abuse the litigation process and leverage our court system to shut people down and to do so by accusing them of peddling fake news or . . . [alternative] facts"). In explaining the reach of the anti-SLAPP statute beyond just news organizations, Representative Tong stated that real estate developers often filed false defamation claims to "bully" private citizens speaking out against proposed projects, in order "to spend down" the objector and to "try to use the litigation process to pressure them into standing down."[14] Id., p. 6901; see id., pp. 6901–6902, remarks of Representative Richard A. Smith ("I . . . would hate to see somebody's right to free speech and their right to contest a hearing—whatever it might be on a zoning level or anywhere else—to have that right stymied just because somebody else has a bigger pocket book").

Most significant, in responding to a question from

Representative Smith about how much time a trial court would have to rule on a special motion to dismiss under the anti-SLAPP statute, Representative Tong emphasized the nature of the statutory right. He observed that "[t]ime is of the essence" because the special motion to dismiss is "an extraordinary remedy and you want to make sure that it is dispatched as quickly as possible *to avoid . . . undue litigation and abuse of the process* as . . . the cost of litigation is ever more expensive and at an hourly rate when the meter's running, it can get pretty high pretty quickly, particularly on early motion practice and particularly in civil practice, so . . . we want to try to avoid that, particularly when you're dealing with an individual citizen who's just trying to speak on [a] matter of public concern. You don't want to run the bills up so that it becomes prohibitive for them to vindicate their rights."[15] (Emphasis added.) Id., pp. 6921–22. Representative Tong went on to describe the nature of the special motion to dismiss proceeding under § 52-196a as a "substantial hearing" or a "[mini-trial] at the outset," akin to that for a prejudgment remedy. Id., p. 6945.

The purpose of the "extraordinary remedy" provided by the anti-SLAPP statute persuades us that its substantive benefit—a right to avoid costly and burdensome litigation on the merits—would be lost if defendants were required to litigate putative SLAPP cases to conclusion following the erroneous denial of a special motion to dismiss.[16] Id., p. 6921, remarks of Representative Tong. The statute's extensive legislative history indicates that the legislature was particularly concerned about defendants laboring under the burden of having to defend against SLAPP suits, which are by definition frivolous and oppressive, as a consequence of having exercised their first amendment rights. This renders the benefit conferred by the anti-SLAPP statute analogous to other statutory and common-law rights to avoid litigation on the merits—such as double jeopardy, collateral estoppel, res judicata, and absolute or sovereign immunity—which this court has deemed to qualify as final judgments under § 52-263 and *Curcio* because they cannot be vindicated by an appeal following the conclusion of trial before the trial court. See, e.g., *Halladay* v. *Commissioner of Correction*, supra, 340 Conn. 63–64 (citing cases).

Indeed, the right to speak freely without reprisal from frivolous and burdensome lawsuits, protected by § 52-

196a, is particularly analogous to a trial court's denial of a claim of collateral estoppel; see, e.g., *Convalescent Center of Bloomfield, Inc.* v. *Dept. of Income Maintenance*, 208 Conn. 187, 195, 544 A.2d 604 (1988); and denials of summary judgment on the basis of the common-law absolute immunity accorded to participants in judicial and quasi-judicial proceedings; see *Chadha* v. *Charlotte Hungerford Hospital*, supra, 272 Conn. 786–87; both of which this court has held to be appealable under the second prong of *Curcio*. In *Convalescent Center of Bloomfield, Inc.*, this court considered whether a trial court's order rejecting the defendant's claim of collateral estoppel and remanding the case for further administrative proceedings was ripe for appellate review. See *Convalescent Center of Bloomfield, Inc.* v. *Dept. of Income Maintenance*, supra, 192. In concluding that the trial court's denial of a claim of collateral estoppel was appealable under the second prong of *Curcio*, we held that, "[i]f the defendant is correct that the plaintiffs are precluded from relitigating their entitlement to reimbursement, it would be *unfair to require the defendant to expend its resources to defeat the plaintiffs' claims on the merits*. We have held an interlocutory order to be final for purposes of appeal if it involves a claimed right the legal and practical value of which would be destroyed if it were not vindicated before trial. . . . In this respect, the defense of collateral estoppel is a civil law analogue to the criminal law's defense of double jeopardy, *because both invoke the right not to have to go to trial on the merits*. Like the case of a denial of a criminal defendant's colorable double jeopardy claim, [when] immediate appealability is well established . . . the . . . judgment denying the defendant's claim of collateral estoppel is a final judgment." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 194–95.

Likewise, our holding in *Chadha* that there was an appealable judgment under *Curcio*'s second prong was "dictated by the underlying purpose of the immunity afforded at common law to those who provide information in connection with judicial and quasi-judicial proceedings, namely, that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements. . . . Put simply, absolute immunity furthers the public policy of encouraging participation and candor in judicial and quasi-judicial proceedings. *This objective would be*

*thwarted if those persons whom the common-law doctrine was intended to protect nevertheless faced the threat of suit."* (Citation omitted; emphasis added; internal quotation marks omitted.) *Chadha* v. *Charlotte Hungerford Hospital*, supra, 272 Conn. 786–87; see, e.g., *Dayner* v. *Archdiocese of Hartford*, 301 Conn. 759, 770–72, 23 A.3d 1192 (2011) (concluding that denial of motion to dismiss employment discrimination action based on first amendment ministerial exception was appealable final judgment because "the very act of litigating a dispute that is subject to the ministerial exception would result in the entanglement of the civil justice system with matters of religious policy, making the discovery and trial process itself a first amendment violation"). But cf. *Harger* v. *Odlum*, 153 Conn. App. 764, 770–71, 107 A.3d 430 (2014) (denial of motion to dismiss medical malpractice action based on failure to file proper opinion letter required by General Statutes § 52-190a was not appealable final judgment under second prong of *Curcio* because "the defendant [did] not [allege] that health care professionals have any statutory or constitutional right already secured to them that *shields them from litigation* akin to the right against double jeopardy or the other types of immunity from suit in the civil context" (emphasis added)).

Put differently, the purpose of the special motion to dismiss under § 52-196a puts it squarely within the category of second prong *Curcio* cases, such as *Convalescent Center of Bloomfield, Inc.*, and *Chadha*, pursuant to which "a colorable claim to a right to be free from an action is protected from the immediate and irrevocable loss that would be occasioned by having to defend an action through the availability of an immediate interlocutory appeal from the denial of a motion to dismiss. . . . The rationale for immediate appellate review is that the essence of the protection of immunity from suit is an *entitlement not to stand trial or face the other burdens of litigation*." (Citation omitted; emphasis added; internal quotation marks omitted.) *Blakely* v. *Danbury Hospital*, supra, 323 Conn. 746. The anti-SLAPP statute affords a defendant a substantive right to avoid litigation on the merits that can be costly and burdensome, and this is undoubtedly a right that would be abrogated if not vindicated by an immediate appeal.[17]

We are further persuaded that a denial of a special motion to dismiss under § 52-196a is an immediately appealable final judgment because of the statute's provi-

sion on attorney's fees. The legislature has provided in subsection (f) (1) of the statute that, "[i]f the court grants a special motion to dismiss under this section, the court shall award the moving party costs and reasonable attorney's fees, including such costs and fees incurred in connection with the filing of the special motion to dismiss." General Statutes § 52-196a (f) (1). If a trial court improperly denies a special motion to dismiss, but the moving party cannot challenge that improper denial in an immediate appeal, a moving party will not be able to vindicate its entitlement to such an award until after a resolution of the merits in its favor. It would be inefficient to require the defendant, after prevailing on the merits before the trial court, to then file an appeal, in which the sole claim would be that the trial court improperly denied a motion to dismiss at the very outset of the case.

We disagree with the plaintiffs' contention that permitting interlocutory appeals in this context will open the floodgates to endless appeals from denials of special motions to dismiss under § 52-196a.[18] First, a defendant who files a special motion to dismiss that is deemed "frivolous and solely intended to cause unnecessary delay" risks liability for an award of attorney's fees and costs pursuant to § 52-196a (f) (2). This potential sanction provides a significant disincentive to a defendant to file an immediate appeal from the denial of a motion to dismiss because he or she may incur additional responsibility for attorney's fees and costs incurred by a plaintiff in defending that appeal.[19] Second, defendants who have failed to prevail on a special motion to dismiss already have an inherent interest in pursuing the most efficient resolution of the suit brought against them. Unfounded interlocutory appeals would, in most cases, only serve to increase the duration of the proceeding and the cost of the defense. Third, the existing rules of practice permit a court to "impos[e] sanctions" for the "[p]resentation of a frivolous appeal or frivolous issues on appeal." Practice Book § 85-2 (5). Courts are permitted to impose "appropriate discipline" on offenders, including a prohibition against appearing in court "for a reasonable and definite period of time" and "costs and payment of expenses, together with attorney's fees to the opposing party." Practice Book § 85-2. Accordingly, a party who loses a special motion to dismiss under § 52-196a in the trial court will risk the imposition of sanctions by the court if the party thereafter brings a frivolous and meritless appeal from the trial court's

denial of a special motion to dismiss.

Our *Curcio* jurisprudence also renders a flood of frivolous interlocutory appeals unlikely. The dispositive inquiry into whether the denial of a special motion to dismiss under § 52-196a is an appealable final judgment under the second prong of *Curcio* is whether the defendant can assert a *colorable claim* of a right to avoid litigation under the anti-SLAPP statute.[20] An appellate court will first have to address "the jurisdictional threshold inquiry of whether the [defendant] has a colorable claim" of a right to avoid litigation under the statute. *In re Santiago G.*, 325 Conn. 221, 231, 157 A.3d 60 (2017). If colorability exists, then the inquiry will focus on "whether the trial court's judgment . . . was proper, namely, the merits of the . . . claim . . . ." Id.; see id., 232 ("[O]n appeal, two separate inquiries must be made. First, the court must determine whether the trial court's decision . . . is a final judgment for jurisdictional purposes; if it is not, then the appeal must be dismissed. . . . If the court determines that the trial court's decision is a final judgment, then it properly has subject matter jurisdiction to analyze and render a decision as to the parties' claims . . . ." (Citation omitted.)). Noncolorable appeals from the denial of a special motion to dismiss, like other noncolorable appeals, will continue to be subject to dismissal for lack of a final judgment. See, e.g., *State* v. *Crawford*, supra, 257 Conn. 776–77, 781 (dismissing appeal because defendant did not present colorable claim of double jeopardy to support availability of interlocutory appeal); *Clark* v. *Clark*, 115 Conn. App. 500, 510, 974 A.2d 33 (2009) (dismissing appeal for lack of final judgment because would-be intervenor did not make colorable claim to intervention as matter of right). This colorability inquiry will serve to weed out frivolous appeals from being reviewed on the merits and to prevent the appellate floodgates from opening.[21]

Finally, our conclusion is consistent with a wealth of federal and sister state case law that applies a *Curcio*-esque analysis[22] in holding that an interlocutory appeal lies from the denial of a special motion to dismiss a SLAPP suit.[23] Most significant, our sister states have found denials of motions to dismiss under their respective anti-SLAPP statutes to be appealable under jurisprudence that mirrors the second prong of *Curcio*, even in the absence of express language in the statute providing a right to an interlocutory appeal. In *Fabre* v. *Walton*,

436 Mass. 517, 781 N.E.2d 780 (2002), the Massachusetts Supreme Judicial Court held that the denial of a special motion to dismiss under the commonwealth's anti-SLAPP statute was appealable under the "doctrine of present execution," which is an exception to the commonwealth's common-law final judgment rule that mirrors the second prong of *Curcio*.[24] Id., 521; see id. (under exception for "the doctrine of present execution . . . immediate appeal of an interlocutory order is allowed if the order will interfere with rights in a way that cannot be remedied on appeal from the final judgment"). The court observed that the anti-SLAPP "statute provides broad protections for individuals who exercise their right to petition from harassing litigation and the costs and burdens of defending against retaliatory lawsuits. . . . In this regard, they are similar in purpose to the protections afforded public officials by the doctrine of governmental immunity." (Citation omitted; footnote omitted.) Id., 520. Analogizing the anti-SLAPP statute's protections to the commonwealth's governmental immunity from suit, under which "[i]nterlocutory orders . . . are appealable pursuant to the doctrine of present execution"; id., 521; the court concluded that "the denial of a special motion to dismiss interferes with rights in a way that cannot be remedied on appeal from the final judgment. The protections afforded by the anti-SLAPP statute against the harassment and burdens of litigation are in large measure lost if the [defendant] is forced to litigate a case to its conclusion before obtaining a definitive judgment through the appellate process. Accordingly . . . there is a right to interlocutory appellate review from the denial of a special motion to dismiss filed pursuant to the anti-SLAPP statute." Id., 521–22; see *Blanchard* v. *Steward Carney Hospital, Inc.*, 483 Mass. 200, 212–13, 130 N.E.3d 1242 (2019) (reaffirming *Fabre* and observing that "[t]he doctrine of present execution . . . applies to anti-SLAPP cases in order to preserve a moving party's 'immunity' from being required to litigate a SLAPP suit"); see also *Morse Bros., Inc.* v. *Webster*, 772 A.2d 842, 848 (Me. 2001) (The court recognized the exception to the common-law final judgment rule in the case of a denial of a special motion to dismiss because "[p]recluding the moving party from appealing a decision on the motion would result in continued litigation, which is the precise harm that the [anti-SLAPP] statute seeks to prevent. In these circumstances, the cost and delay of litigating the claim does constitute 'a loss of substantial rights or permanent

foreclosure of relief.' ");[25] cf. *Gundel* v. *AV Homes, Inc.*, 264 So. 3d 304, 310–11 (Fla. App. 2019) (granting discretionary certiorari review to allow interlocutory appeal from denial of special motion to dismiss because harm of improper denial could not be remedied on appeal after final judgment, insofar as "the [a]nti-SLAPP statute bears some similarity to statutes providing for immunity from suit [when] the statutory protection cannot be adequately restored once it is lost through litigation and trial").[26] But see *Cedar Green Land Acquisition, LLC* v. *Baker*, 212 S.W.3d 225, 228 (Mo. App. 2007) (holding that denial of special motion to dismiss was not appealable because anti-SLAPP statute lacked "specific language" conferring right to interlocutory appeal).

Similarly, the majority of the United States courts of appeals have deemed denials of special motions to dismiss under state anti-SLAPP statutes to be appealable under the collateral order doctrine identified by the United States Supreme Court in *Cohen* v. *Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546, 69 S. Ct. 1221, 93 L. Ed. 1528 (1949), which permits—pursuant to the federal appellate statutes, 28 U.S.C. §§ 1291 and 1292— the appeal of a "small class" of nonfinal orders that implicate a "substantial public interest" and are "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."[27] (Internal quotation marks omitted.) *Will* v. *Hallock*, 546 U.S. 345, 349, 353, 126 S. Ct. 952, 163 L. Ed. 2d 836 (2006). In so concluding, these courts have determined that the anti-SLAPP statutes at issue effectively created a substantive right to avoid litigation on the merits. See *Franchini* v. *Investor's Business Daily, Inc.*, 981 F.3d 1, 7, 8 n.6 (1st Cir. 2020) (surveying federal courts of appeals in holding that collateral order doctrine conferred jurisdiction over interlocutory appeal from "a substantive decision" under Maine's anti-SLAPP law because (1) decision presented question "distinct from the merits of the action" given unique statutory procedure, (2) decision "implicate[d] important societal interests in both [f]irst [a]mendment protections for media outlets, and the substantive statutory rights created under Maine law," and (3) denial of special motion to dismiss was "also effectively unreviewable on appeal from a final order" insofar as defendant would be "denied meaningful relief if it must go through the time and expense of fully litigating [the] matter before it [could] address the anti-SLAPP issue"); *Los Lobos*

*Renewable Power, LLC* v. *AmeriCulture, Inc.*, 885 F.3d 659, 666–67 (10th Cir.) (rejecting argument under *Cohen* that "the rights enshrined in New Mexico's anti-SLAPP statute could be protected after final judgment because they [did] not shield defendants from the burden of standing trial" because "the New Mexico anti-SLAPP statute aims to nip harassing litigation in the bud, thus protecting potential victims from the effort and expense of carrying on a frivolous lawsuit"), cert. denied, U.S. ___, 139 S. Ct. 591, 202 L. Ed. 2d 427 (2018); *NCDR, LLC* v. *Mauze & Bagby, PLLC*, 745 F.3d 742, 752 (5th Cir. 2014) (concluding that denial of special motion to dismiss filed pursuant to Texas anti-SLAPP statute was interlocutory appeal under collateral order doctrine because "[a] legislatively approved immunity from trial, as opposed to a mere claim of a right not to be tried, is imbued with a significant public interest," and "[i]t would be difficult to find a value of a high[er] order than the [constitutionally protected] rights to free speech and petition that are at the heart of [an] anti-SLAPP statute" (internal quotation marks omitted)); *Henry* v. *Lake Charles American Press, LLC*, 566 F.3d 164, 178, 180–81 (5th Cir. 2009) (holding that denial of special motion to dismiss filed pursuant to Louisiana's anti-SLAPP statute was appealable under collateral order doctrine because it "provide[s] defendants the right not to bear the costs of fighting a meritless defamation claim," statute's "importance weigh[ed] profoundly in favor appealability" because such statutes "aim to curb the chilling effect of meritless tort suits [challenging] the exercise of [f]irst [a]mendment rights," and interlocutory appeals "are more freely allowed" in free speech cases (internal quotation marks omitted)); C. Barylak, Note, "Reducing Uncertainty in Anti-SLAPP Protection," 71 Ohio St. L.J. 845, 880–81 (2010) (supporting interlocutory appeals from denials of special motions to dismiss insofar as "SLAPPs differ from other types of litigation because victory and defeat lie not in final judgment, but in the ability of one party to entangle the other in burdensome, frivolous litigation," and "[the] [p]rovision for immediate appeal is consistent with both the objectives of the collateral order doctrine and anti-SLAPP laws"). But see *Ernst* v. *Carrigan*, 814 F.3d 116, 119–22 (2d Cir. 2016) (order passing on merits of special motion to strike filed pursuant to Vermont's anti-SLAPP statute was not appealable under collateral order doctrine because it did not "resolve an important issue *completely separate from the merits* of the action"

given that analysis of motion was "entangled in the facts" and elements of claims, and rejecting analogy to qualified immunity as not requiring fact based analysis (emphasis in original; internal quotation marks omitted)); *Metabolic Research, Inc.* v. *Ferrell*, 693 F.3d 795, 801–802 (9th Cir. 2012) (concluding that then effective version of Nevada's anti-SLAPP statute was not immediately appealable under collateral order doctrine given statutory language suggesting that it provided " 'immunity from civil liability,' " in comparison to California statute that provided interlocutory state court appeal and immunity from suit).[28]

We deem these collateral order cases and scholarship particularly persuasive, insofar as § 52-196a renders the court's determination on a special motion to dismiss entirely independent of the merits of the case by providing that the "findings or determinations made" in connection with the hearing on that motion or the attorney's fee determination "shall not be admitted into evidence at any later stage of the proceeding or in any subsequent action." General Statutes § 52-196a (g). We conclude, therefore, that the denial of a special motion to dismiss based on a *colorable claim* of a right to avoid litigation under § 52-196a is an immediately appealable final judgment under the second prong of *Curcio*.

We next consider whether the defendants in the present case have asserted a colorable claim that they are entitled to protection under our anti-SLAPP statute, which is required to warrant a conclusion that the trial court's denial of their special motion to dismiss is appealable under *Curcio*. See *State* v. *Curcio*, supra, 191 Conn. 34. The defendants argue that they have asserted a colorable claim under both the statute's "right of free speech" and "right of association" categories.

It is well established that "[a] colorable claim is one that is superficially well founded but that may ultimately be deemed invalid . . . . For a claim to be colorable, the defendant need not convince the trial court that he necessarily will prevail; he must demonstrate simply that he *might* prevail." (Citation omitted; emphasis in original; internal quotation marks omitted.) *In re Santiago G.*, supra, 325 Conn. 231; see id., 233 ("our examination of whether a colorable claim exists focuses on the plausibility of the appellant's challenge to the denial of the motion to intervene when the pleadings and motion are viewed in light of the relevant legal principles"); *State* v. *Komisarjevsky*, 302 Conn. 162, 192–93, 25 A.3d

613 (2011) (*Zarella, J.*, concurring in part and dissenting in part) (trial court's granting of motion to vacate order sealing defendant's witness list was appealable final judgment because "[t]he facts in the record, all relied on by the majority in its analysis of the merits of the [claim]," established "a colorable claim that delay of appellate review threaten[ed] to abrogate his due process right to a fair trial"); *Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.*, supra, 279 Conn. 236–37 n.16 ("[a]lthough we express no view regarding the ultimate merits of the plaintiffs' claim that they are entitled to prepleading security under § 38a-27 (a) . . . the plaintiffs have made a colorable claim that, contrary to the conclusion of the trial court, that statutory provision applies to their action against the defendants" (citations omitted)); *State* v. *Curcio*, supra, 191 Conn. 36 ("[u]ndoubtedly, [when] defendants make a colorable claim that a trial court proceeding subjects them to double jeopardy, they are entitled to have this challenge heard on appeal before trial").

On the basis of our review of the record, we conclude that the defendants have asserted a colorable claim that the conduct alleged in the complaint falls within the meaning of the phrase "right of association," as it is used in our anti-SLAPP statute. That statute defines the phrase "right of association" broadly to include any "communication among individuals who join together to collectively express, promote, pursue or defend common interests . . . ."[29] General Statutes § 52-196a (a) (4). Subsection (b) further requires that an exercise of the right of association be in connection with a "matter of public concern"; General Statutes § 52-196a (b); which, in turn, is defined in relevant part as "an issue related to (A) health or safety, (B) environmental, economic or community well-being . . . [or] (D) a public official or public figure . . . ."[30] General Statutes § 52-196a (a) (1). These categories are not further defined in the statute, but courts have generally held that speech on the topic of race relations or racial discrimination is "a matter inherently of public concern" under the first amendment. *Connick* v. *Myers*, 461 U.S. 138, 148 n.8, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); see, e.g., *Calvit* v. *Minneapolis Public Schools*, 122 F.3d 1112, 1117 (8th Cir. 1997) (criticism by employee of public school's policy based on racial classification was matter of public concern under first amendment).

Before the trial court, the defendants argued that

their conduct falls under the "community well-being" category because the statute's language warrants a broad reading of the term "community." In particular, they argued that the controversy concerning the club's recognition, on which the flyers commented, is a concern to, at the very least, both the Trinity community and the community surrounding it.[31]

Before this court, the defendants likewise argue that their claim under the right of association is colorable, and that the trial court erred with respect to the merits, because that category, as defined in § 52-196a (a) (4), does not require that the conduct take place in a public forum or impose a state action requirement. In support of this assertion, the defendants note that there is no express language in that definition imposing those requirements, in contrast to the "public forum" language in § 52-196a (a) (2).

We conclude that the defendants have asserted a colorable claim that their conduct in posting the flyers around campus, after the protests against the club's recognition began, constituted a "communication among" and with other students on campus who were joining together to pursue a "common interest," namely, preventing the club from being recognized and funded by the SGA, on a "matter of public concern." Indeed, the defendants in the present case have asserted a colorable claim that their conduct relates to topics of race relations and racial discrimination, as the flyers contain references to Smith's previous remarks on race and protest the club's recognition because of its affiliation with Smith's remarks and sentiments. In other words, the defendants have a superficially well founded claim that their conduct relates to "community well-being."[32] Although we recognize that the defendants' claim under the right of association may ultimately be deemed to lack merit, we conclude that the defendants have "demonstrate[d] simply that [they] *might* prevail" under § 52-196a. (Emphasis in original; internal quotation marks omitted.) *State* v. *Crawford*, supra, 257 Conn. 776. Accordingly, we conclude that the defendants have asserted a colorable claim that they are entitled to a right to avoid litigation under the anti-SLAPP statute and, therefore, that the trial court's denial of their special motion to dismiss under § 52-196a constitutes an appealable final judgment under *Curcio*.[33]

The appeal is transferred to the Appellate Court for further proceedings according to law.

In this opinion McDONALD, MULLINS and PRES-COTT, Js., concurred.

\* This case was originally argued on October 12, 2022, before a panel consisting of Chief Justice Robinson, and Justices McDonald, D'Auria, Mullins, Ecker and Alexander. Thereafter, Judge Prescott was added to the panel. He has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this opinion.

[1] "SLAPP is an acronym for strategic lawsuit against public participation . . . ." (Internal quotation marks omitted.) *Lafferty* v. *Jones*, 336 Conn. 332, 337 n.4, 246 A.3d 429 (2020), cert. denied,      U.S.      , 141 S. Ct. 2467, 209 L. Ed. 2d 529 (2021).

[2] General Statutes § 52-196a provides in relevant part: "(b) In any civil action in which a party files a complaint, counterclaim or cross claim against an opposing party that is based on the opposing party's exercise of its right of free speech, right to petition the government, or right of association under the Constitution of the United States or the Constitution of the state in connection with a matter of public concern, such opposing party may file a special motion to dismiss the complaint, counterclaim or cross claim.

* * *

"(d) The court shall stay all discovery upon the filing of a special motion to dismiss. The stay of discovery shall remain in effect until the court grants or denies the special motion to dismiss and any interlocutory appeal thereof. Notwithstanding the entry of an order to stay discovery, the court, upon motion of a party and a showing of good cause, or upon its own motion, may order specified and limited discovery relevant to the special motion to dismiss.

* * *

"[e] (3) The court shall grant a special motion to dismiss if the moving party makes an initial showing, by a preponderance of the evidence, that the opposing party's complaint, counterclaim or cross claim is based on the moving party's exercise of its right of free speech, right to petition the government, or right of association under the Constitution of the United States or the Constitution of the state in connection with a matter of public concern, unless the party that brought the complaint, counterclaim or cross claim sets forth with particularity the circumstances giving rise to the complaint, counterclaim or cross claim and demonstrates to the court that there is probable cause, considering all valid defenses, that the party will prevail on the merits of the complaint, counterclaim or cross claim. . . ."

[3] The plaintiffs also brought this action against a student newspaper at Trinity and certain individuals associated with the newspaper, but they later withdrew the complaint as to those defendants. For the sake of simplicity, all references herein to the defendants are to Supple, Montejo, Xiong-Calmes, and Moreno.

[4] In 2017, Smith also published a post in the "Alumni for a Better Trinity College" group on Facebook, which lamented the racism being experienced by "Western" and "American" individuals. In that post, Smith wrote in relevant part: "The new racism is every bit as ugly as the old; and it is every bit as divisive. Until we get beyond this kind of hate, we have no real hope of living together as fellow citizens and friends. . . ." Smith continued: "Trinity needs a genuine, open discussion of where we have arrived and clarity about all the ways in which the new racism, with its anti-Western and anti-American sentiments, is descending on [Trinity]."

[5] Although this language was taken from a particular Facebook post authored by Smith; see footnote 4 of this opinion; the defendants' flyers neither contained quotation marks nor otherwise attributed a source.

[6] General Statutes § 52-196a (a) (2) defines "right of free speech" as "communicating, or conduct furthering communication, in a *public forum* on a matter of public concern . . . ." (Emphasis added.)

[7] In reaching this conclusion, the trial court looked to the New Jersey

Supreme Court's decision in *State* v. *Schmid*, 84 N.J. 535, 423 A.2d 615 (1980), appeal dismissed sub nom. *Princeton University* v. *Schmid*, 455 U.S. 100, 102 S. Ct. 867, 70 L. Ed. 2d 855 (1982), which noted that another private college, Princeton University, was a "predominantly private, unregulated and autonomous" institution, lacking the "close nexus" to the state necessary for it to be subject to the first amendment; (internal quotation marks omitted) id., 548; and that "the attachment of [f]irst [a]mendment requirements to [Princeton] University by virtue of the general public's permitted access to its property would still be problematic." Id., 551.

[8] General Statutes § 52-196a (a) (4) broadly defines "right of association" as "communication among individuals who join together to collectively express, promote, pursue or defend common interests . . . ."

[9] Because the trial court found that the defendants had failed to meet their burden under the first prong of § 52-196a (e) (3), it did not reach the issue of whether the plaintiffs met their burden under the statute's second prong.

[10] General Statutes § 52-263 provides: "Upon the trial of all matters of fact in any cause or action in the Superior Court, whether to the court or jury, or before any judge thereof when the jurisdiction of any action or proceeding is vested in him, if either party is aggrieved by the decision of the court or judge upon any question or questions of law arising in the trial, including the denial of a motion to set aside a verdict, he may appeal to the court having jurisdiction from the final judgment of the court or of such judge, or from the decision of the court granting a motion to set aside a verdict, except in small claims cases, which shall not be appealable, and appeals as provided in sections 8-8 and 8-9."

[11] Our determination of whether there is an appealable final judgment in the present case turns in part on whether the anti-SLAPP statute confers a right *independent* of the first amendment itself. The first amendment provides immunity from liability, and we have previously held that immunity from liability is not appealable under *Curcio*. See *Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.*, supra, 279 Conn. 232 ("There is a crucial distinction to be drawn between a right not to be tried and a right [the] remedy [of which] requires the dismissal of charges. . . . The former necessarily falls into the category of rights that can be enjoyed only if vindicated prior to trial. The latter does not." (Internal quotation marks omitted.)).

[12] Historically, the term "SLAPP," or "strategic lawsuit against public participation," appears to have been coined in 1988, when it "was used in two separate scholarly articles," in which the authors, Professors Penelope Canan and George W. Pring, "posited that there was a nationwide trend in which large commercial interests utilized litigation to intimidate citizens who otherwise would exercise their constitutionally protected right to speak in protest against those interests. The scholars asserted that the goal of such litigation was not to prevail, but to silence or intimidate the target, or to cause the target sufficient expense so that he or she would cease speaking out. . . . [S]een in this stark light, SLAPP suits are an improper use of our courts." *LoBiondo* v. *Schwartz*, 199 N.J. 62, 85–86, 970 A.2d 1007 (2009), citing P. Canan & G. Pring, "Strategic Lawsuits Against Public Participation," 35 Soc. Probs. 506 (1988), and P. Canan & G. Pring, "Studying Strategic Lawsuits Against Public Participation: Mixing Quantitative and Qualitative Approaches," 22 Law & Society Rev. 385 (1988).

[13] The proceedings in the Senate on the anti-SLAPP statute were similar to those in the House of Representatives. Speaking in support of the bill, Senator Paul R. Doyle described the special motion to dismiss as intended "to assist people [who] are sued on [the basis of] their free speech rights to have a means to quickly get rid of frivolous lawsuits." 60 S. Proc., Pt. 6, 2017 Sess., p. 2235. He described it as "a mechanism that can save money for defendants that are wrongly targeted for simply exercising their rights . . . on the [first] [a]mendment and other matters of public concern." Id., pp. 2235–36, remarks of Senator Doyle; see id., pp. 2236–37, remarks of Senator John A. Kissel (describing high costs of litigation and anti-SLAPP statute as response to "someone with a lot of money [who] wants to develop property . . . [or] wants to shut down newspaper[s] or broadcasters or

anything like that, or just people [who] . . . if you mention their name they file a lawsuit and just hope for the best").

[14] In the property development context, one court has aptly described SLAPP suits as a "figurative litigation 'asteroid,'" stating that "the [a]nti-SLAPP statute aims to remedy the [fallout] from the unwarranted maintenance of litigation launched to deter, punish or intimidate efforts at critical public comment and participation in governmental proceedings involving the [suit bringer's] interests. Thus, metaphorically, the [wrongfully brought] litigation, within the scope of the statute, is akin to a 'killer asteroid' intended to make extinct the complaints and complainants opposing the plaintiff's initiatives that require governmental approval." *MCB Woodberry Developer, LLC* v. *Council of Owners of Millrace Condominium, Inc.*, 253 Md. App. 279, 287, 265 A.3d 1140 (2021).

[15] To this end, Representative Tong stated that the usual 120 day rule would continue to apply to the trial court's decision on the pending special motion to dismiss; see 60 H.R. Proc., supra, p. 6920; see also General Statutes § 51-183b; but also indicated his "hope" and "expect[ation] that the court would act before then . . . . I think the reason why it says as soon as practicable in [§ 52-196a (e) (4)] is because of the constitutional rights implicated . . . . They're important. It's important to vindicate those rights often because when you're speaking on a matter of public concern or you're trying to exercise a right to associate or petition the government, it's time sensitive." 60 H.R. Proc., supra, p. 6921.

[16] The plaintiffs argue that the statute's legislative history makes it clear that its purpose is to provide only a procedural means for short-circuiting litigation. We acknowledge that the anti-SLAPP statute provides a procedural mechanism to stay discovery and to dismiss a lawsuit before discovery ensues. The statute, however, creates this procedural mechanism to achieve an important substantive goal, namely, protecting the parties from expensive and time-consuming lawsuits on the merits. In that sense, the statute provides an "expedited off-ramp" for a party to avoid further litigation.

[17] The dissent places significant emphasis on the fact that the legislature has not expressly provided for a right to an immediate appeal in our anti-SLAPP statute. See part IV A of the dissenting opinion. We disagree. To reiterate, the fact that § 52-196a does not itself provide an express right of appellate jurisdiction does not thereby foreclose our inquiry under our final judgment jurisprudence set forth in *State* v. *Curcio*, supra, 191 Conn. 31. By definition, an analysis under the *Curcio* test is *only* ever required in cases in which the legislature has not expressly provided a right to interlocutory appeal within the statute at issue. See, e.g., *Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.*, supra, 279 Conn. 238 ("Although the legislature is free to make it clear in the language of a statute that an immediate appeal may be taken from an order of the court, the absence of such language is not determinative of whether such a right exists. . . . Rather, we presume that the legislature is aware of our [long-standing] final judgment jurisprudence. . . . Consequently, unless the legislature has made its intent clear regarding the appealability of an interlocutory order under a particular statute, our determination of whether that order is immediately appealable hinges on whether the order meets the test articulated in *Curcio*." (Citations omitted.)). In deciding whether an order meets the test set forth in *Curcio*, we previously have considered—as we consider today—among other things, a statute's purpose and legislative history, our own and other courts' final judgment jurisprudence, and public policy. See, e.g., id., 232–38; see also, e.g., *U.S. Bank National Assn.* v. *Crawford*, supra, 333 Conn. 743; *Sena* v. *American Medical Response of Connecticut, Inc.*, supra, 333 Conn. 46–52.

[18] The plaintiffs correctly observe that this form of argument is best understood as a policy consideration to be weighed by courts in determining whether a final judgment exists under the second prong of *Curcio*. See *U.S. Bank National Assn.* v. *Crawford*, supra, 333 Conn. 745–46.

[19] The legislative history of the anti-SLAPP statute bears out the importance of the attorney's fees provision in ensuring the appropriate use of the special motion to dismiss. Representative Tong described the attorney's fees provision as a measure against "the very frivolousness that the statute is designed

to avoid or deter" because the special motion to dismiss is "an extraordinary remedy . . . to terminate a litigation early"; he emphasized that, "if a party avails [itself] of this process [it] should do so in good faith as well and have a good basis for doing so, so . . . the attorney's fees provision is a check on the parties because of the extraordinary nature of the relief sought to ensure that . . . the parties do so in good faith and don't waste the court's time." 60 H.R. Proc., supra, pp. 6911–12; see id., pp. 6955–56, remarks of Representatives Tong and Craig Fishbein (discussing purpose of mandatory attorney's fees provision).

[20] As we discuss subsequently in this opinion, colorability requires only a superficially well founded claim of a right to avoid litigation under the anti-SLAPP statute. See, e.g., *In re Santiago G.*, 325 Conn. 221, 231, 157 A.3d 60 (2017).

[21] As our appellate courts start to address the substantive provisions of the anti-SLAPP statute, the reach and the applicability of the statute will become clearer. This will also allow the dividing line between colorable and noncolorable claims that a trial court improperly denied a motion to dismiss to become more discernable. Importantly, then, defendants considering an appeal from a denial of a special motion to dismiss will have guidance in making that determination as our jurisprudence develops.

[22] An examination of federal and sister state case law is particularly instructive with respect to the jurisdictional issue before us because the legislative history of our anti-SLAPP statute signifies that it was modeled after anti-SLAPP statutes that came before it in other states. Senator John A. Kissel noted that Connecticut's anti-SLAPP statute "is a compilation of some of the best laws . . . from throughout the United States" and that "[w]e are not the first state to move in this direction . . . ." 60 S. Proc., Pt. 6, 2017 Sess., p. 2236. Likewise, Representative Tong, advocating for the passage of Connecticut's anti-SLAPP statute, noted that "twenty-nine other states have adopted . . . legislation very similar to the construct we have here." 60 H.R. Proc., supra, p. 6884.

[23] In addition to the decisions discussed subsequently in this opinion, we note that numerous other states have enacted legislation specifically providing for interlocutory appeals of denials of anti-SLAPP special motions to dismiss. See, e.g., *Benton* v. *Benton*, 39 Cal. App. 5th 212, 216–18, 252 Cal. Rptr. 3d 118 (2019) (noting that legislature provided for interlocutory appeal from denial of special motion to strike under California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16 (i), with commercial speech exception provided by Cal. Civ. Proc. Code § 425.17 (e)), review denied, California Supreme Court, Docket No. S258466 (November 26, 2019); *Geer* v. *Phoebe Putney Health System, Inc.*, 310 Ga. 279, 280, 282–85, 849 S.E.2d 660 (2020) (discussing interlocutory appeal procedure under Georgia's anti-SLAPP statute, Ga. Code Ann. § 9-11-11.1 (e)); *Stark* v. *Lackey*, 136 Nev. 38, 39 n.1, 458 P.3d 342 (2020) (discussing Nevada's anti-SLAPP statute, Nev. Rev. Stat. § 41.670 (4), which makes denial of special motion to dismiss "independently appealable" via interlocutory appeal to Nevada Supreme Court); *Cordova* v. *Cline*, 396 P.3d 159, 163–65 (N.M. 2017) (concluding that interlocutory appeal provided by New Mexico's anti-SLAPP statute, N.M. Stat. Ann. § 38-2-9.1, is available to parties regardless of whether they have pending counterclaims); *Steidley* v. *Community Newspaper Holdings, Inc.*, 383 P.3d 780, 782 (Okla. Civ. App. 2016) (discussing Okla. Stat. Ann. tit. 12, § 1437, "which provides a specific right to appeal the denial of a motion to dismiss brought pursuant to the Oklahoma Citizens Participation Act"); *Penllyn Greene Associates, L.P.* v. *Clouser*, 890 A.2d 424, 432 n.8 (Pa. Commw. 2005) (noting right to "an interlocutory appeal as of right" from denial of special motion to dismiss based on "immunity" under Pennsylvania's anti-SLAPP statute, 27 Pa. Stat. and Cons. Stat. Ann. § 8303), appeal denied, 591 Pa. 719, 919 A.2d 960 (2007); *Nandigam Neurology, PLC* v. *Beavers*, 639 S.W.3d 651, 663–64 (Tenn. App. 2021) (noting that Tennessee's anti-SLAPP statute, Tenn. Code Ann. § 20-17-106, provides express right to interlocutory appeal to intermediate appellate court from denial or grant of special motion to dismiss); *In re Lipsky*, 460 S.W.3d 579, 585–86 n.2 (Tex. 2015) (noting that Texas legislature amended interlocutory appeal statute, Tex. Civ. Prac. & Rem. Code Ann. § 51.014, to make denials of special motions to dismiss appealable in light of conflicting decisions on that point from that state's intermediate appellate courts); cf. *Ryan* v. *Fox Television Stations, Inc.*, 979 N.E.2d 954, 958–59 n.1 (Ill. App. 2012) (discussing Ill. Sup. Ct. R. 306

(a) (9), which invoked Illinois Supreme Court's authority under Illinois constitution to allow interlocutory appeals from denials of special motions to dismiss under anti-SLAPP statute).

[24] Massachusetts' anti-SLAPP statute is similar to ours. It provides "a procedural remedy that permits the defendant in a SLAPP suit to file a 'special' motion to dismiss early in the litigation, which a judge shall grant, 'unless the party against whom such special motion is made shows that: (1) the moving party's exercise of its right to petition was devoid of any reasonable factual support or any arguable basis in law and (2) the moving party's acts caused actual injury to the responding party.' [The statute] also include[s] the automatic stay of discovery [upon] the filing of a special motion to dismiss." *Fabre* v. *Walton*, supra, 436 Mass. 520.

[25] Maine's anti-SLAPP statute, which is also similar in its wording to our anti-SLAPP statute, provides in relevant part: "When a moving party asserts that the civil claims, counterclaims or cross claims against the moving party are based on the moving party's exercise of the moving party's right of petition under the Constitution of the United States or the Constitution of Maine, the moving party may bring a special motion to dismiss. . . . The court shall grant the special motion, unless the party against whom the special motion is made shows that the moving party's exercise of its right of petition was devoid of any reasonable factual support or any arguable basis in law and that the moving party's acts caused actual injury to the responding party. In making its determination, the court shall consider the pleading and supporting and opposing affidavits stating the facts upon which the liability or defense is based. . . ." Me. Rev. Stat. Ann. tit. 14, § 556 (2003). The statute then provides that "[a]ll discovery proceedings are stayed upon the filing of the special motion under this section, except that the court, on motion and after a hearing and for good cause shown, may order that specified discovery be conducted. The stay of discovery remains in effect until notice of entry of the order ruling on the special motion." Me. Rev. Stat. Ann. tit. 14, § 556 (2003).

[26] We note that the Florida Supreme Court has not conclusively determined whether, under Florida law, the denial of a special motion to dismiss creates irreparable harm for purposes of certiorari jurisdiction over interlocutory appeals. See *Geddes* v. *Jupiter Island Compound, LLC*, 341 So. 3d 353, 353 (Fla. App. 2022) (disagreeing with *Gundel* and certifying conflict to Florida Supreme Court); *WPB Residents for Integrity in Government, Inc.* v. *Materio*, 284 So. 3d 555, 556 (Fla. App. 2019) (same); see also H. Blum, Note, "SLAPPing Back in Federal Court: Florida's Anti-SLAPP Statute," 76 U. Miami L. Rev. 345, 368 and n.160 (2021).

[27] Subsequent United States Supreme Court case law has established that, for an order to fall within the "small" and "narrow" class that qualifies for interlocutory review under the collateral order doctrine, it must "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action, and [3] be effectively unreviewable on appeal from a final judgment." (Internal quotation marks omitted.) *Will* v. *Hallock*, 546 U.S. 345, 349, 126 S. Ct. 952, 163 L. Ed. 2d 836 (2006). This court previously has deemed collateral order doctrine case law under *Cohen* instructive in our application of *Curcio*'s second prong. See *Melia* v. *Hartford Fire Ins. Co.*, 202 Conn. 252, 255–57, 520 A.2d 605 (1987) (relying on *Cohen* and concluding that discovery orders, including those implicating attorney-client privilege, are not appealable final judgments); see also *U.S. Bank National Assn.* v. *Crawford*, supra, 333 Conn. 744 ("we consider federal court decisions to be persuasive when we are considering the scope of [our] authority" to "treat appeals that are otherwise interlocutory in character as appeals from final judgments if they satisfy *Curcio*," despite lack of statutory discretionary jurisdiction such as that conferred by 28 U.S.C. § 1292 (b)).

[28] We note that the Ninth Circuit also previously held that the then effective version of Oregon's anti-SLAPP statute did not create a right to an immediate appeal. See *Englert* v. *MacDonell*, 551 F.3d 1099, 1107 (9th Cir. 2009). In that case, the court found it particularly instructive that the Oregon legislature had not made any special provision in the statute, similar to that providing for an appeal in California's anti-SLAPP statute, for appellate relief from the denial of a motion to strike. See id., 1105–1106. The court held that "[t]his provide[d] compelling evidence that [Oregon's anti-SLAPP statute] was intended to do nothing more than provide the defendants with a procedural device to obtain prompt review by a nisi prius judge of the

likelihood that the plaintiff would be able to come forward with sufficient evidence to get to a jury." Id., 1107. In contrast, our anti-SLAPP statute is not devoid of any reference to an appeal. In fact, although § 52-196a does not provide an express grant of an immediate appeal from denials of special motions to dismiss, the language in subsection (d) very well may indicate that the legislature intended for the availability of an immediate appeal under the auspices of *Curcio*. See *Hartford Accident & Indemnity Co.* v. *Ace American Reinsurance Co.*, supra, 279 Conn. 237–38 (legislature is presumed to be aware of Connecticut's final judgment jurisprudence).

[29] "Although not expressly enumerated in the first amendment, the right of association has been recognized as a fundamental right under the first amendment as well. It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the liberty [en]sured by the [d]ue [p]rocess [c]lause of the [f]ourteenth [a]mendment, which embraces freedom of speech." (Internal quotation marks omitted.) *State* v. *Bonilla*, 131 Conn. App. 388, 394, 28 A.3d 1005 (2011).

[30] Before the trial court, the defendants specifically argued that their rights under the anti-SLAPP statute were implicated because their conduct in posting the flyers around campus was related to a "matter of public concern" under (1) the "health or safety" category, (2) the "environmental, economic or community well-being" category, and (3) the "public official or public figure" category. General Statutes § 52-196a (1) (A), (B) and (D).

[31] The record indicates that, some time after the posting of the flyers, local news organizations, such as The Hartford Courant and WFSB-TV, reported on the controversy surrounding the club and the response on campus. The record further indicates that, some time after the posting of the flyers, a petition seeking to prevent the club's formal recognition was circulated on the Internet for signatures.

[32] Regardless of whether "community" means the community at large or the campus community at Trinity, an issue we need not conclusively address for purposes of this appeal, the defendants have at a minimum asserted a colorable claim by describing the general newsworthiness of the controversy on and off of campus; see footnote 31 of this opinion; and that the controversy impacts both the campus and surrounding community. In addition, the defendants have at least a superficially well founded claim that, because the definition of "right of free speech" requires use of a "public forum," when the statutory definition of the "right of association" does not, the fact that Trinity is a private institution has no bearing on the analysis of the latter right under the first step of § 52-196a (e) (3). Similarly, the defendants also have asserted a colorable claim that the trial court erred in imposing a state action requirement under their right of association claim. The anti-SLAPP statute was created to target actions when, often times, the underlying dispute is between two private parties. See footnote 15 of this opinion and accompanying text. Indeed, the tort of defamation itself typically involves disputes between private parties, with the subject matter of the particular dispute dictating the scope of the first amendment protections warranted. See, e.g., *Gleason* v. *Smolinski*, 319 Conn. 394, 430–32, 125 A.3d 920 (2015).

[33] Because we conclude that the defendants have asserted a colorable claim under the "right of association" category on a matter relating to "community well-being," we need not consider whether the conduct at issue may also constitute an exercise of the "right to free speech" or a "matter of public concern" relating to either "health or safety" or "public official[s] or public figure[s]," as defined in § 52-196a (a). Because the trial court's decision in the present case focused exclusively on the first step of the burden shifting analysis set forth in § 52-196a (e) (3), we likewise express no opinion as to whether the plaintiffs may ultimately succeed in showing that there is probable cause, considering all valid defenses, that they will prevail. See footnote 9 of this opinion.